THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KURT HUMAN, Defendant-Appellant.

First District (5th Division)   No. 1—01—0070

Opinion filed June 7, 2002.

Rita A. Fry, Public Defender, of Chicago (Robert P. Davidow, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Kathleen Warnick, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GREIMAN delivered the opinion of the court:

At the conclusion of a jury trial, the defendant, Kurt Human, was convicted of one count of battery and four counts of aggravated assault. Defendant was sentenced to one year of conditional discharge and 30 days in the Cook County Department of Corrections.

The issues presently before the court are (1) whether the trial court abused its discretion when it decided not to allow the introduction of the third-party confession of defense witness Eric Leeson, (2) whether it was proper for the police to show a single photo of defendant to the victims while the victims were in the presence of one another, (3) whether it was proper for the trial court not to allow Eric Leeson to take the witness stand for the purpose of exercising his fifth amendment privilege against self-incrimination, and (4) whether the trial court's decision not to allow Eric Leeson to be exhibited to the jury deprived defendant of his due process right to make a defense.

On April 1, 2000, from 7 p.m. until 11 p.m., 16-year-old John Sadler, 14-year-old Amy Morrissey, 13-year-old Katie McCord, 14-year-

old Sarah Sabatino and 11-year-old Angela Morrissey went roller skating at a rink located at 87th Place and Southwest Highway. After roller skating, they went to Pizza Plus, which is located in the same mall, to get some soda. At approximately 11:20 p.m., they left Pizza Plus and began walking home west down 87th Place.

John, Katie and Amy walked in front of Angela and Sarah. As the group walked toward the corner they observed defendant standing in the parking lot beneath a streetlight. As the group walked closer to defendant, he began to walk in circles. According to the testimony of the entire group, they moved to the other side of the street. John testified that he instructed the girls to keep walking and not look back. Despite John's direction, the girls glanced at defendant. Defendant then removed a pellet gun from his waistband and began shooting at the group. John testified that he directed the girls to position themselves behind him so they would not get shot and to run home. One of the shots struck John on the right side of his head and another grazed the back of his head. After being shot, John stated that he yelled at defendant and ran home. According to John and Amy, no one beside defendant was in the area at the time of the shooting.

John's house is located behind the roller rink at 87th Place and Keeler. The girls ran in the opposite direction toward the Morrissey house, which is less than one block from where the shooting occurred. Angela and Amy both testified that Angela began to cry as she was running home and tripped. Amy had to drag Angela to their house. Amy testified that when she turned to pick up her sister, she saw defendant calmly walking in their direction like nothing happened. When the girls arrived at the Morrissey house, they banged on the door and screamed. From the porch of the Morrissey house, Katie and Angela testified that they saw a black hat through the fence. The girls testified that they relayed what happened to Mrs. Morrissey and that John called the Morrissey house to say that he had been shot. Mrs. Morrissey and John then contacted the police.

At trial, Amy, Angela, Katie and Sarah gave nearly identical descriptions of defendant. Each of the girls testified that despite the fact that John told them not to look back and to keep running, they each looked back at the shooter. The girls testified that defendant was approximately 5 feet 10 inches, heavy set and dressed in dark clothing, including a black hat with a bill. Furthermore, each of the girls described the shooter as having an unshaven beard. Due to the bill on the shooter's hat, the girls testified that they could not see his entire face. On cross-examination, Katie was specifically asked to describe any additional facial features of the shooter besides his facial hair, but she could not. Similarly, Angela and Sarah specifically indicated in

their testimony that they could only see the lower half of the shooter's face.

Officer Tom Brokop testified on behalf of the State. According to Brokop's testimony, while he was en route to the Morrissey house he did not observe anyone in the area. Brokop testified that the girls briefly told him what happened and stated that defendant was wearing dark clothing. Brokop further stated that the girls recalled that defendant had a scruffy beard, was approximately 5 feet 10 inches and somewhat heavy. Brokop then left the Morrissey house and went to the home of John Sadler.

Brokop testified that he interviewed John and photographed his injuries. Brokop stated that the projectile that struck John on the side of the head caused a hole, which ultimately left a scar. John gave Brokop a description of defendant's clothing but was unable to give a description of his face. John testified that he could not give a detailed description of the shooter because he was not wearing his glasses on the night of the incident.

After interviewing the girls and John, Brokop testified that he returned to the police station where he advised Officer James Kouski of the situation. Kouski obtained a photograph of defendant from a prior arrest to show to the victims. Brokop testified that he and Kouski decided to show the victims a photograph of defendant because on two prior occasions defendant was involved in "some neighborhood trouble" with local teenagers.

Officer Frank Hickey testified that one week prior to the incident at bar he responded to a complaint of kids crossing someone's yard in the vicinity of where the shooting occurred. Hickey stated that when he arrived at the scene, he did not find a complainant or an offender, so he drove around the area to see if he could find a group of kids. On 87th Place between Keeler and Merrion Lane, Hickey testified that he found a group of four to five teenagers, none of whom are the victims in the case at bar. While speaking with the teenagers, Hickey testified that the complainant and defendant drove up. According to Hickey's testimony, defendant asked him what he was going to do about these teenagers crossing people's yards and throwing litter. Hickey testified that he responded to defendant's question by stating that he had warned the teenagers about crossing people's yards. Further, Hickey testified that he looked around and did not see any litter in the area. Hickey stated that defendant responded to him by stating, "Well, if you are not going to do your damn job, then I will."

Brokop also testified that they knew defendant lived approximately 50 yards from where the incident occurred. Further, at this point, Brokop stated that the officers determined that a pellet gun had been

used based on the noise described to them by the female victims and the size of the injury sustained by John.

Next, the officers returned to the Morrissey house and showed the photograph of defendant to all of the girls at the same time, except for Sarah, who had already returned home. Katie, Amy, and Angela all agreed that the man in the photograph was the shooter. Later, the officers went to Sarah's house to show her the photograph. Like the other girls, Sarah also identified the man in the photograph as the shooter. The officers then showed the photograph to John, who stated that since he did not see the shooter's face, he could not state whether the man in the photograph was the shooter.

Next, Brokop testified that he proceeded to the defendant's address. Once Brokop arrived at the defendant's home, he asked defendant to accompany him to the police station. Brokop testified that he noticed defendant had a "scruffy beard." Brokop did not have a search warrant and, therefore, did not search defendant's house. A pellet gun was never recovered.

At the close of the State's case, defense counsel moved for a directed finding, arguing that the photo identification was highly suggestive, and, therefore, the identification was insufficient. The trial court denied the motion.

Jeffrey Bunting testified on behalf of the defendant. Jeffrey testified that on April 1, 2000, he, Eric Leeson, and Eric's fiancée, Laura, arrived at defendant's apartment at approximately 8:30 p.m. At the time of the incident, defendant was married to Kelly Human, who lived with him at their apartment. Jeffrey testified that defendant went to bed shortly after he, Eric, and Laura arrived at his apartment. At about 9 p.m. or 9:30 p.m., Jeffrey stated that he, Kelly, Eric, and Laura went into the backyard of the apartment complex where they remained until about 11:30 p.m., at which time they left. Jeffrey further testified that for the duration of time that everyone, except for defendant, was in the backyard, he never entered the apartment. Jeffrey stated that while he was in the backyard he never heard any gunshots or screaming. Lastly, Jeffrey testified that he does not know whether defendant owns a pellet gun; however, he knows for certain that Eric owns a pellet gun because he has shot it in Eric's basement.

Laura Beth Minkalis testified that she, along with Eric, her fiancé, and Jeffrey, went to defendant's apartment on the night of April 1, 2000, to visit Kelly. Laura testified that they arrived at defendant's apartment between 4 p.m. and 6 p.m. Upon their arrival, Laura stated that they went inside and talked for a while and then she, Eric, Kelly, and Jeffrey went to the Jewel. After returning to defendant's apartment at about 8:30 p.m., Laura testified that defendant went to bed

while she and the others went outside to the backyard to talk. Laura stated that while outside, she went back into the apartment for about a 45-minute period of time to use the washroom and make something to eat. When Laura went back outside, she stated that they decided it was time to leave. Laura testified that she looked at the clock in Eric's car when they were leaving and noted that it was 11:22 p.m. On the night of the incident, Laura testified, she never heard any gunshots or screaming. Laura stated that although she knows Eric owns a pellet gun, she has never seen him with it.

Kelly Leeson testified that she is the sister of Eric Leeson and at the time of the incident she was married to defendant. According to Kelly's testimony, on April 1, 2000, at approximately 7:30 p.m., Jeff, Eric, and Laura arrived at her apartment. Shortly after their arrival, Kelly testified that defendant, Eric, and Jeff went to a garage in the neighborhood to look at a car while she and Laura went to the grocery store. Kelly stated that she and Laura arrived home before defendant, Eric, and Jeff. When defendant arrived home, Kelly testified that he stated he needed to go to bed because he had an early tee time the next morning. According to Kelly, she, Jeff, Eric, and Laura went out to the backyard to talk. At about 9:30 p.m., Kelly stated, she went back inside and saw that defendant had fallen asleep on the couch, so she woke him up and told him to go into the bedroom. Kelly testified that she did not see defendant again until approximately 11:30 p.m., when she went to bed.

Kelly further testified that at some point in the evening Eric and Jeff were standing outside defendant's truck for approximately five minutes. Kelly stated that at about 11:20 p.m., she, Laura, Jeff, and Eric went inside to get Eric's car keys and then she walked them out and returned to her apartment. According to Kelly, it was 11:37 p.m. when Eric drove away.

Finally, Kelly testified that at no point throughout the night did she see Jeff, Eric, or Laura with any type of gun. Further, Kelly stated that defendant does not own any type of gun and that she would never allow a gun in her house.

Next, the trial court revisited defense counsel's motion *in limine* to admit into evidence the third-party confession of Eric Leeson. Further, defense counsel requested that Eric be exhibited to the jury. Outside the presence of the jury, Eric was called to testify. When questioned on direct examination, Eric repeatedly invoked his fifth amendment right against self-incrimination. After discussing the contents of Eric's confession, the trial court found that Eric's confession was totally uncorroborated by the witnesses' testimony and, therefore, was unreliable. As a result, the trial court held that it could

not be properly admitted into evidence. The trial court never expressly ruled on defense counsel's request to exhibit Eric to the jury; however, implicit in the trial court's decision not to admit Eric's confession is the trial court's decision not to allow Eric to be exhibited to the jury.

Defense counsel made an offer of proof as to the testimony of Scott and Nancy Leeson, Eric Leeson's parents. Namely, defense counsel stated that Eric's parents would testify that their son owned a pellet gun on the night in question and that they accompanied Eric when he confessed to the crime at bar in the presence of police officers and assistant State's Attorneys. The State then made a counter offer of proof. According to the State, Officer Kouski would testify that on May 4, 2000, Eric Leeson's attorney allowed Eric to be questioned by police officers and an assistant State's Attorney. The State contended that Eric admitted that at approximately 11 p.m. he saw kids walking near defendant's house while he was in the backyard alone. Further, the State asserted that Kouski would testify that Eric stated that he retrieved a pellet gun from his car and admitted to shooting at the group of teenagers with the intention of scaring them. Eric allegedly stated that Kelly, Laura, Jeff, and defendant could not verify his conduct because they were not in the backyard when the shooting occurred.

Defendant testified that on April 1, 2000, after Eric, Jeff, and Laura arrived at his apartment, he, Eric, and Jeff left to see a car defendant had recently purchased. Defendant testified that when they returned, they watched television for a short while and then, at approximately 8:15 p.m., defendant announced that he was going to bed. According to defendant, he fell asleep on the couch and then went into his bedroom. Defendant further testified that the next occurrence he remembered was Kelly waking him up and telling him that the police were there to talk with him.

Defendant testified that he told the police he did not shoot a pellet gun at anyone. Defendant admitted that on March 25, 2000, he was angry that the police officers were not going to do anything about the teenagers who walked across the neighbor's lawn and littered; however, defendant denied telling Officer Hickey that he was going to take the matter into his own hands.

Following closing arguments, the jury deliberated and found defendant guilty on all counts. Defendant's motion for a new trial was denied. Defendant was sentenced to one year of conditional discharge and 30 days in the Cook County department of corrections.

The first issue before us is whether the trial court abused its discretion when it decided not to allow the introduction of the third-party confession of defense witness Eric Leeson. Defendant contends

that the trial court erred when it refused to allow testimony that Eric Leeson confessed to the crime. The State asserts that after considering all the pertinent facts pertaining to admissibility, the trial court properly decided not to admit Eric's confession.

■ The admission of evidence is within the sound discretion of the trial court and should not be reversed absent a clear showing of abuse of discretion. *People v. Bowel*, 111 Ill. 2d 58, 68 (1986), quoting *People v. Ward*, 101 Ill. 2d 443, 455-56 (1984). "Generally an extrajudicial declaration not under oath, by the declarant, that he, and not the defendant on trial, committed the crime is inadmissible as hearsay though the declaration is against the declarant's penal interest." *Bowel*, 111 Ill. 2d at 66, citing *People v. Tate*, 87 Ill. 2d 134, 143 (1981); *People v. Craven*, 54 Ill. 2d 419, 427 (1973); *People v. Lettrich*, 413 Ill. 172, 178 (1952). An exception to this rule exists where justice requires that the declaration be admitted. *Bowel*, 111 Ill. 2d at 66, citing *Lettrich*, 413 Ill. at 178.

■ In *Chambers v. Mississippi*, 410 U.S. 284, 300-01, 35 L. Ed. 2d 297, 311-12, 93 S. Ct. 1038, 1048-49 (1973), the United States Supreme Court held that a declaration against penal interest is admissible where there is sufficient indicia of trustworthiness in that (1) the statement was made spontaneously to a close acquaintance shortly after the crime occurred; (2) the statement was corroborated by other evidence; (3) the statement was self-incriminating and against the declarant's interest; and (4) there was adequate opportunity for cross-examination of the declarant. In *Bowel*, 111 Ill. 2d at 67, the Illinois Supreme Court stated that these four factors are not to be considered requirements of admissibility, but rather they are to be regarded simply as indicia of trustworthiness. These four factors should merely be used as a guideline for determining whether "the declaration was made under circumstances that provide 'considerable assurance' of its reliability by objective indicia of trustworthiness." *Bowel*, 111 Ill. 2d at 67, citing *Chambers*, 410 U.S. at 300-01, 35 L. Ed. 2d at 311-12, 93 S. Ct. at 1048-49, and *Tate*, 87 Ill. 2d at 144. "Accordingly, the existence or nonexistence of the four factors present in *Chambers* is not determinative of the issue but, rather, the ultimate decision as to admissibility is determined by the totality of the circumstances." *People v. Jones*, 302 Ill. App. 3d 892, 898 (1998); see, *e.g.*, *People v. Anderson*, 291 Ill. App. 3d 843, 849 (1997); *People v. Swaggirt*, 282 Ill. App. 3d 692, 700 (1996).

In *People v. Tenney*, 205 Ill. 2d 411 (2002), the Illinois Supreme Court noted that other courts have recognized the narrow holding set forth in *Chambers*. More specifically, the court quoted the Seventh Circuit Court of Appeals and a Massachusetts court, stating:

" '*Chambers* did not do away with the hearsay rule. The Supreme Court contemplated that the [trial] judge would be a gatekeeper, that unreliable statements could be excluded. *** It did not abolish the hearsay rule on constitutional grounds.' *Lee v. McCaughtry*, 933 F.2d 536, 538 (7th Cir. 1991). Thus, 'Federal and State courts have expressed the belief that *Chambers* has not significantly trammeled judicial discretion to exclude unreliable declarations against penal interest.' *Commonwealth v. Carr*, 373 Mass. 617, 625, 369 N.E.2d 970, 975 (1977)." *Tenney*, 205 Ill. 2d at 435-36.

In *People v. Kokoraleis*, 149 Ill. App. 3d 1000 (1986), this court loosely applied the test set forth in *Chambers*, realizing that a determination of whether a declaration is admissible should be based on a totality of the circumstances. The declarants in *Kokoraleis* made their statements to an assistant State's Attorney and police officers while in custody. *Kokoraleis*, 149 Ill. App. 3d at 1020-21. The *Kokoraleis* court held that these statements "were more likely trustworthy because they tended to intensify police efforts to prosecute" the declarants. *Kokoraleis*, 149 Ill. App. 3d at 1020-21. Neither of the declarants in *Kokoraleis* stood to benefit by admitting his role in the offense. *Kokoraleis*, 149 Ill. App. 3d at 1021. Furthermore, the *Kokoraleis* court noted that if called to testify, both declarants would have invoked their fifth amendment right, and they elected not to testify. *Kokoraleis*, 149 Ill. App. 3d at 1023. Despite the unavailability of the declarants, this court held "[g]iven the obvious inculpatory character of the statements made by both declarants while in custody to the law-enforcement personnel, these statements are more likely than not to be trustworthy." *Kokoraleis*, 149 Ill. App. 3d at 1021.

■ The narrow issue before us is whether Eric's confession was made under circumstances that provide considerable assurance of its reliability. For several reasons, we find Eric's confession to be reliable. First, Eric was accompanied to the courthouse by his parents and his attorney where he confessed in the presence of an assistant State's Attorney and police officers. Second, Eric's confession was corroborated by other evidence offered at trial. At trial, Kelly, Jeffrey and Laura each testified that they did not know where Eric was at all times throughout the night. Additionally, Jeffrey and Laura testified that Eric owned a pellet gun. The testimony of Kelly, Jeffrey, and Laura leaves open the possibility that Eric was in fact the shooter. We note that while trial counsel asserted that Eric and defendant resemble one another, the State's witnesses viewed Eric on the day of his confession and they said he was not the shooter. Third, it is readily apparent that Eric did not stand to benefit from his statements. Eric's statement was self-incriminating and against his penal interest. " 'No credible

argument could be made that making that declaration was not against his penal interest.' " *Tenney*, 205 Ill. 2d at 437, quoting *People v. Rice*, 166 Ill. 2d 35, 47 (1995) (Harrison, J., dissenting, joined by Bilandic, C.J., and McMorrow, J.).

For these reasons, our facts show overwhelmingly that Eric could be charged for the crime at bar. Indeed, we can infer that Eric came forward in 33 days so that defendant's charges would be dismissed. Thus, we find that the circumstances under which Eric confessed, coupled with the self-incriminating nature of his statements, makes his confession reliable.

The second issue before the court is whether it was proper for the police to show a single photo of defendant to the victims while the victims were in the presence of one another. Defendant asserts that the identifications made by the victims were so suggestive that they created a substantial likelihood of misidentification. The State contends that defendant has waived any objection to the admissibility of the out-of-court identifications. Further, the State argues that the evidence of defendant's guilt was overwhelming where the testimony of the five victims was clear and consistent and was corroborated by additional evidence at trial.

In the case at bar, Amy, Katie, and Angela were simultaneously presented with a single photograph of defendant and from this photograph each of the girls identified defendant as the shooter. The police officers then went to Sarah's house and showed her defendant's photograph. Sarah identified defendant as the shooter. Next, the officers proceeded to John's house. Like Sarah, John was alone when he was shown defendant's photograph; however, John told the officers that he could not identify the shooter from the photograph.

A review of the record shows that the victims each gave similar descriptions of the shooter. More specifically, Amy, Katie, Angela, Sarah, and John all testified that they told the police that the shooter was approximately 5 feet 10 inches tall and somewhat heavy. The girls also stated that they told the police that the shooter had an unshaven beard and that it was difficult to see his entire face because he was wearing a baseball hat. Additionally, the girls testified that defendant was dressed in dark clothing. The most vague description of the shooter was given by John, because when the incident occurred, he was not wearing his glasses and, therefore, had a difficult time seeing the shooter.

The crux of defendant's argument is that the victims should not have been shown a single photo show-up. According to defendant, the display of a single photo gave rise to an unreliable and suggestive identification. The State contends that irrespective of whether a single

photo show-up was proper, the in-court identifications were sufficient to sustain defendant's conviction. The State argues that each of the victims who identified defendant in court had a clear view of defendant at the scene of the shooting and, thus, an independent basis exists for each of the victims' pretrial identification of defendant.

■ It is well settled that to properly preserve an issue for review, both a trial objection and a written posttrial motion raising the issue are required. *People v. Ward*, 154 Ill. 2d 272, 293 (1992), quoting *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). In the case at bar, defendant did not file a pretrial motion to suppress the identification of defendant. Further, at trial, defendant did not object to the admission of testimony regarding the out-of-court identifications by the victims. The record shows that defendant contested the out-of-court identifications by the victims only insofar as defense counsel made a motion for a directed finding arguing that the identification was suggestive. The trial judge denied defendant's motion, noting that the issue of suggestiveness only went to the weight to be given to the evidence. The record also reflects that defendant made an oral motion for a new trial. The record is devoid of a written motion for a new trial. In his oral motion, defendant argued that the trial court erred in admitting evidence of the out-of-court identifications. The State responded by arguing that defendant should have challenged the identifications prior to trial. Defendant's motion for a new trial was denied.

Since defendant failed to object to the admissibility of the evidence of the out-of-court identifications prior to or at the time of the admission into evidence, this issue has been waived on appeal.

■ The third issue for examination is whether it was proper for the trial court not to allow Eric to take the witness stand for the purpose of exercising his fifth amendment privilege against self-incrimination. In the case at bar, Eric stated, outside of the presence of the jury, that he would claim his fifth amendment privilege if he was called to testify. This issue involves an evidentiary ruling, and since evidentiary rulings are within the discretion of the trial court, the trial court's ruling will not be disturbed absent an abuse of discretion. *People v. Hoffstetter*, 203 Ill. App. 3d 755 (1990).

■ This court has repeatedly held that it is improper for a party to call a witness whom it has reason to believe will invoke his fifth amendment privilege before the jury; therefore, a trial judge does not err when he precludes calling such a witness. *People v. Nally*, 134 Ill. App. 3d 865, 869-70 (1985), citing *People v. Myers*, 35 Ill. 2d 311, 334 (1966); *People v. Crawford Distributing Co.*, 78 Ill. 2d 70 (1979); *People v. Cvetich*, 73 Ill. App. 3d 580 (1979). In *People v. Cedillo*, 142 Ill. App. 3d 849, 852 (1986), over the defendant's objection, the court barred a

witness from testifying because the witness indicated that, if called to testify, he would invoke his privilege against self-incrimination. The appellate court affirmed the ruling of the trial court. *Cedillo*, 142 Ill. App. 3d at 852.

Similarly, in *People v. Hammond*, 196 Ill. App. 3d 986, 992-93 (1990), the trial court judge instructed the jury to disregard any testimony given by a witness who stated that he would invoke his fifth amendment privilege if he was asked certain questions. The *Hammond* court found no material difference between striking testimony involving the invocation of the fifth amendment right and barring such testimony beforehand. *Hammond*, 196 Ill. App. 3d at 993. The court specifically stated that "in this instance, the witness' invocation of his constitutional privilege inured to the benefit of the defendant." *Hammond*, 196 Ill. App. 3d at 993-94. In other words, the *Hammond* court found that the jury could have concluded that the witness, by simply invoking his fifth amendment right, rather than the defendant, was guilty. *Hammond*, 196 Ill. App. 3d at 994. The appellate court found "no reversible error either in the procedure followed or in the order striking [the witness's] testimony." *Hammond*, 196 Ill. App. 3d at 994.

■ In consideration of the controlling, Illinois case law governing this issue, there is no need for us to address *State v. Bumgarner*, 299 N.C. 113, 261 S.E.2d 105 (1980), an out-of-state case. Further, *People v. Izquierdo*, 262 Ill. App. 3d 558 (1994), another case cited to by defendant, is not on point with the facts at hand. In *Izquierdo*, 262 Ill. App. 3d at 563, the appellate court held that "[i]t is reversible error for a prosecutor to force a witness to assert his fifth amendment privilege if either the State makes an obvious attempt to build its case out of inferences arising from the privilege or where the witness'[s] refusal to testify added critical weight to the State's case." See *People v. O'Dell*, 84 Ill. App. 3d 359, 373 (1980). It is clear from the holding in *Izquierdo* that the posture of *Izquierdo* differs from the posture of the case at bar and, therefore, is inapplicable. In the case at bar, Eric was called to the witness stand by the defense, not by the prosecution. Moreover, unlike in *Izquierdo*, there are no allegations that the prosecution was attempting to treat Eric as a hostile witness in hope of furthering its theory of the case.

The case law of the State of Illinois clearly indicates that in a situation such as the one at bar, the witness should not be called to testify if he is going to invoke his fifth amendment privilege against self-incrimination. Inviting such a witness to testify before the jury only serves to mislead the jury. Thus, we hold that since Eric plainly stated that he would invoke his fifth amendment right if called to testify, the trial court did not err in barring him from testifying.

■ The fourth issue before us is whether the trial court's decision not to allow Eric to be exhibited to the jury deprived defendant of his due process right to make a defense. It was specifically called to the attention of the trial court judge that Eric and the defendant resembled one another and that, due to their resemblance, defense counsel wanted to exhibit Eric to the jury. The trial court judge never expressly ruled on whether Eric could be exhibited to the jury; however, implicit in the trial court's ruling that Eric's confession could not be admitted into evidence was the trial court's decision not to allow Eric to be exhibited to the jury. After all, without the introduction of the confession into evidence, there would be no probative value in exhibiting Eric to the jury.

Upon the trial court ruling that the confession would not be allowed into evidence, defense counsel never made an offer of proof regarding Eric's alleged resemblance to the defendant. It is well settled that "[w]hen a trial court refuses evidence, no appealable issue remains unless a formal offer of proof is made." *People v. Peeples*, 155 Ill. 2d 422, 457 (1993), citing *People v. Montgomery*, 51 Ill. App. 3d 324, 331 (1977). Since an offer of proof regarding Eric's physical appearance was never made, this issue has been waived.

Even if this issue had not been waived, we find that displaying Eric to the jury in the absence of his confession would have been meaningless to the jury. However, had the confession been admitted, then the requisite relevancy would have been established and exhibiting Eric to the jury would have been proper.

The introduction of a person as evidence relative to identification is governed by the rules applicable to the introduction of evidence. *People v. Ward*, 193 Ill. App. 3d 677, 682 (1990). Generally, the law of evidence is governed by the principle that what is relevant is admissible. *Ward*, 193 Ill. App. 3d at 682, quoting *People v. Monroe*, 66 Ill. 2d 317, 321 (1977), quoting *People ex rel. Noren v. Dempsey*, 10 Ill. 2d 288, 293 (1957). "Relevancy is established where a fact offered tends to prove a fact in controversy or renders a matter in issue more or less probable." *Ward*, 193 Ill. App. 3d at 682, citing *People v. Free*, 94 Ill. 2d 378, 413 (1983). In recognition of the aforementioned rules of evidence, before Eric can be exhibited to the jury, the defendant must establish that the person of Eric Leeson is relevant so that displaying him before the jury and the witnesses would tend to make it more probable or less probable that defendant was the shooter than it would be without the evidence. Thus, although we recognize that this issue has been waived, we note that since relevancy had not been established, the trial court properly determined not to exhibit Eric.

For the foregoing reasons, we reverse defendant's conviction and remand the case for a new trial consistent with this opinion.

Reversed and remanded.

CAMPBELL, P.J., and QUINN, J., concur.