NO. 4-06-0488      Filed 1/16/08

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Vermilion County |
| AMMON GRAY, | ) | No. 05CF324 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Craig H. DeArmond, |
| | ) | Judge Presiding. |

_____

JUSTICE COOK delivered the opinion of the court:

In February 2006, a jury found defendant, Ammon Gray, guilty of first degree murder (720 ILCS 5/9-1(a)(3) (West 2004)), armed robbery (720 ILCS 5/18-2(a)(1) (West 2004)), and home invasion (720 ILCS 5/12-11(a)(2) (West 2004)). The State later tried a codefendant, Marlon Williams, in a separate trial. As to the charge of first degree murder in particular, defendant was convicted on an accountability theory. In June 2006, the trial court sentenced defendant to concurrent terms of 60, 30, and 30 years, respectively. Defendant appeals, alleging that the trial court committed reversible error in refusing to admit potentially exculpatory evidence that defendant contends supported a by-stander defense. We reverse and remand for a new trial.

I. BACKGROUND

Defendant Gray and codefendant Marlon Williams worked with murder victim Kenneth Blondeel at an industrial plant.

Other coworkers testified that Blondeel had been telling people at work that he had just inherited "a lot" of money from his mother's estate. Scottie Polk, a worker at the plant, testified that he overheard Williams and defendant speculating as to how much money Blondeel had inherited. Polk overheard Williams and defendant talking about "kicking in the door" to Blondeel's house and robbing him. There is some dispute as to whether Blondeel was also involved in the discussion.

Rachel Ryan, Blondeel's girlfriend, who was pregnant with Blondeel's child at the time of the incident, testified that Blondeel had just inherited approximately $17,000. On the night in question, Ryan and Blondeel were lying in bed when they heard a knock on the door at approximately 11:45 p.m. Ryan was sure that it was their friend Rudy because Rudy was the only person who would come calling so late at night. The caller was in fact Rudy, and Ryan heard Blondeel and Rudy talking for about 15 minutes. When Rudy left, Blondeel went back to bed. Ryan and Blondeel fell back asleep. Ryan then was awakened by another knock at the door. Ryan woke Blondeel up, told Blondeel that Rudy was back, and told Blondeel to answer the door. Ryan stayed in the bedroom.

It was not Rudy. Ryan heard two male voices and, through the crack of the bedroom door, saw Blondeel let two men into the kitchen. In court, Ryan identified the two men as

Williams and defendant. Williams and defendant were talking loudly, telling Blondeel that they wanted to "hang out." Williams and defendant appeared drunk. Williams and defendant wanted to know why Blondeel had not been at work that day. Blondeel told them he quit his job because he "got a stack of money." Williams asked Blondeel where he kept the money. When Ryan heard this, she "got a bad feeling," took Blondeel's wallet out of the nightstand, and hid it behind the bed. Williams then asked Blondeel for the money several times, but Blondeel told Williams it was in the bank. Ryan could not call for help because Blondeel did not have a landline and Ryan did not know where Blondeel had left his cellular telephone.

At this point, Blondeel ran into the bedroom. Williams and defendant followed Blondeel. Williams told Ryan, "Get back in bed before I beat your ass." Ryan did so because she was scared. Williams then repeatedly hit Blondeel in the face. Defendant hit Blondeel once or twice. Williams dragged Blondeel out into the living room. Ryan heard them arguing. Williams then told defendant to bring Ryan out into the living room. Defendant made Ryan sit on the ottoman. Williams backed Blondeel up against the front door and continued to demand the money. Blondeel kept insisting that he did not have the money and finally offered Williams his automated teller machine (ATM) card so that Williams could withdraw the money. Williams then took

out a knife and stabbed Blondeel in the face. Defendant then came up on the other side of Blondeel and said, "Don't be stupid. Just give us the money." Williams and defendant both began hitting defendant. Blondeel was yelling, "Quit it. I thought we were friends." Blondeel then escaped into the kitchen.

In trying to placate Williams and defendant, Blondeel told them that he had $1,000 in his wallet. Blondeel told Ryan to go get his wallet, which actually contained only $150 and the ATM card. Ryan saw Blondeel's stun gun behind the bed when she went to get the wallet but the gun was cased and Ryan did not know how to use it. Ryan came out of the bedroom and gave the wallet to defendant. Williams became very angry when he saw that only $150 was in the wallet. Williams began to stab Blondeel in the chest, arms, and head.

Defendant took Ryan into the living room. Defendant kept his hands on Ryan. When Ryan looked into the kitchen to see what was happening, defendant forced her head down. Blondeel continued to struggle to get away from Williams. Blondeel made it back into the living room, and Williams slammed Blondeel's head against the entertainment center. At one point, Blondeel made it all the way over to Ryan and told her that he loved her and that he thought Williams and defendant were going to kill him. Somehow Blondeel ended up back in the kitchen. Ryan heard Blondeel scream Williams' name. Williams then said, "Now your

- 4 -

girlfriend knows my name so we will have to kill her." Blondeel said, "Don't hurt her. She's pregnant." Blondeel later screamed, "I just want to have a family." Williams told Blondeel to "shut up."

Defendant told Ryan that he would protect her if she did whatever Williams wanted. Defendant then went outside and started talking on his cellular phone. Ryan followed defendant outside. Williams saw Ryan start to go outside and told Ryan, "If you go out there, [defendant] will beat your ass." Defendant saw Ryan and brought her back inside.

Williams continued to attack Blondeel. Williams ultimately slit Blondeel's throat. Williams then asked defendant for a cigarette and began to smoke. Williams said they could not leave until Blondeel died. After Williams finished his cigarette, he stabbed Blondeel again and kicked Blondeel in the stomach while Blondeel was dying. Ryan testified that the entire chain of events, from the time Williams and defendant knocked on the door until the time Blondeel died, seemed to last several hours.

After Blondeel died, Williams made Ryan go with Williams and defendant to the ATM machine. Ryan testified that it took between 30 to 45 minutes to locate Williams' car because Williams had parked the car far from Blondeel's apartment. Williams drove to the ATM machine and then waited in the car

while defendant and Ryan withdrew $200. Ryan tried to withdraw more money but was denied. Ryan told defendant that she was denied because the inheritance money was in the bank and not accessible through an ATM machine. Williams drove to another ATM machine at a gas station with a convenience store. The ATM at the gas station also denied Ryan access to additional money. While at the gas station, Ryan made eye contact with one of two convenience-store clerks and pointed to blood that had gotten on her shirt during the killing. Ryan mouthed to the clerk to call the police. Both clerks later testified that Ryan had tried to get their attention. The clerks wrote down the license number of Williams' car but did not call the police. Williams then drove away from the gas station and parked the car under a viaduct. Williams told Ryan she was lucky to be alive. Williams showed Ryan the knife he had used to kill Blondeel and told Ryan that if she reported him, he would kill her. Williams let Ryan out of the car and drove away. Ryan subsequently ran to an ex-boyfriend's house and alerted police. It was then 5:16 a.m., on May 22, 2005.

On cross-examination, Ryan testified that Blondeel had used cocaine on the day of the incident. Ryan also testified that, in her initial report to police, which took place at 7 the morning of the incident, she did not state that defendant hit Blondeel. Instead, Ryan initially told police that defendant

- 6 -

"didn't do anything," defendant never had a weapon, and defendant appeared as though he wanted to leave. Ryan told police that Williams had committed all the violent actions against Blondeel and that defendant had been "really nice to [Ryan]," telling Ryan that he would protect her.

On redirect, Ryan testified that she had been in a state of shock when she gave her initial statement to police and, at that point in time, felt that defendant was the reason she had survived the incident. Ryan testified that it was not until nearly a month later that her memory and concentration improved to the point where she told police an account more in keeping with what she testified to at trial, i.e., that defendant also hit Blondeel, defendant had an opportunity to leave when he went outside to talk on his cellular telephone, and defendant stopped Ryan from leaving. Ryan had hired an attorney at this point because she worried that the police suspected her of being an accomplice.

Just before opening statements were made, defense counsel stated he wanted to discuss Marlon Williams' videotaped statement to the police. The State objected the statement was hearsay. Defense counsel argued that the statement, which contained evidence exculpating defendant, should be admitted as an exception to the hearsay rule as a statement against penal interests based on Williams' unavailability. Defense counsel

argued it was the State's decision to sever the trials and to try defendant first, thereby rendering Williams unavailable to testify. The State argued that the objective indicia of trustworthiness listed in Chambers v. Mississippi, 410 U.S. 284, 294, 35 L. Ed. 2d 297, 308, 93 S. Ct. 1038, 1045 (1973), were not met because the statement was not to a close acquaintance, it was to a police officer. Also it did not make any difference that defendant was tried first, because "if Marlon Williams goes to trial and gets convicted he still isn't available." The State argued that the cases were severed because it wanted to avoid any argument that its use of Williams' confession, without any opportunity for defendant to cross-examine Williams, deprived defendant of his rights under the sixth amendment. Bruton v. United States, 391 U.S. 123, 126, 20 L. Ed. 2d 476, 479, 88 S. Ct. 1620, 1622 (1968). The trial court refused to allow defense counsel to mention Williams' statement during oral argument. During the trial, defense counsel sought to call Williams as a witness, but Williams invoked his privilege against self-incrimination. After the presentation of evidence was completed, the court readdressed the issue. The court stated that there could not be any due-process violation in severing the trials and defendant's trial proceeding first because Williams' statement was not admissible anyway.

The jury ultimately found defendant guilty of first

degree murder, armed robbery, and home invasion.  The court sentenced defendant as stated.  This appeal followed.

## II. ANALYSIS

At issue on appeal is whether the trial court committed reversible error in refusing to admit Williams' statement to police that defendant did not know what Williams would do and that defendant did not hit Blondeel.  Defendant contends that Williams' statement was exculpatory as to defendant in that the statement supported that defendant was not accountable for Williams' actions.  As such, defendant argues that the trial court's refusal to admit the statement deprived defendant of his due-process right to present a defense.  Chambers, 410 U.S. at 294, 35 L. Ed. 2d at 308, 93 S. Ct. at 1045.  We review a trial judge's decision to exclude hearsay statements under an abuse-of-discretion standard.  People v. Anderson, 367 Ill. App. 3d 653, 663-64, 856 N.E.2d 29, 38 (2006).  A court abuses its discretion when its decision is clearly against logic, when it acts arbitrarily, without employing conscientious judgment, or when in view of all the circumstances, the court exceeded the bounds of reason and ignored recognized principles of law so that substantial prejudice resulted.  People v. Wear, 371 Ill. App. 3d 517, 529, 867 N.E.2d 1027, 1038 (2007).

The transcript of Williams' statement to police that defendant sought to admit states in pertinent part:

- 9 -

"Q. [Defendant] didn't hit [Blondeel]?

A. No, [defendant] didn't touch [Blondeel].

Q. Didn't do anything *** stab him, didn't touch him?

A. Didn't touch him.

Q. OK. That was all you?

A. That was all me.

Q. OK, did [defendant] have any idea what you guys [were] going to do when you showed up down there?

A. No, but I told him *** I intentionally wanted to go over and do that.

Q. OK, what was your intent?

A. That was my intention, to go over there and talk to him.

Q. OK.

A. That was it.

Q. What happened to make this all ***

A. Let me see. He told me *** told me no.

Q. He told you no about the money?

A. 'cause I didn't get the money *** no, I wasn't gonna get no money.

- 10 -

Q. So when you hit him, asking for some money and he said no, you just got mad? Right?

A. [no audible response]

Q. What kind of knife was it?

A. Like a flip out."

Courts are reluctant to sever trials so that a codefendant who is unwilling to testify in his own trial may be called as a witness. There is no assurance that the codefendant will waive his constitutional privilege against self-incrimination if called as a witness at a separate trial. People v. Watkins, 3 Ill. App. 3d 560, 564, 278 N.E.2d 156, 159 (1972). Even if the testifying defendant is tried first, this will not inevitably wipe out any basis for his later claiming reliance upon the privilege against self-incrimination. In the present case, however, Williams did not claim the privilege at his own trial but in fact testified. Even if Williams had been tried first and then claimed the privilege at defendant's subsequent trial, Williams' testimony would have been admissible against the State as former testimony. 725 ILCS 5/115-10.2(f) (West Supp. 2005). Former testimony has been excluded where the State did not have an effective opportunity to cross-examine, but that case involved former testimony at a suppression hearing where the State "did not have the motive to question [the] codefendant regarding the nature of his relationship with [the] defendant."

People v. Rice, 166 Ill. 2d 35, 41, 651 N.E.2d 1083, 1086 (1995). The present case does not involve a suppression hearing but now includes the actual trial of the declarant, Williams, where he was thoroughly cross-examined on all aspects of the case.

The federal courts have refused to grant a severance where the codefendant's testimony is conditioned on his trial being held first. "The majority of other circuits have held either that such a conditional promise to testify is insufficient because defendants have no right to control the order in which a case will be tried [citations] or that a trial court does not abuse its discretion when it denies severance on the ground that the willingness to testify is conditional." United States v. McNeal, 853 F. Supp. 1047, 1050 (N.D. Ill. 1994). In the present case, however, the decision to sever had already been made, by the State. The State's argument, that it was attempting to protect defendant's rights under Bruton when it severed the cases, makes no sense. The statement was exculpatory and defendant wanted it admitted. Defendant was not concerned about Williams' statement being admitted without his right to cross-examine.

Once a severance was granted in this case, was there any reason why Williams was not tried first? Williams' videotaped statement would have been admissible against him whether he was tried first or second and whether or not he

exercised his privilege against self-incrimination.  The State may have gained some advantage by the order of trials.  If the State had desired that Williams' testimony be used in defendant's trial, it had ways to encourage that result.  The State should not be allowed to prevent Williams from testifying in defendant's case simply because it believed his testimony would be helpful to the defendant.

In Chambers, the defendant called McDonald to the stand, who had previously confessed to the crime.  McDonald repudiated his confession and implicated the defendant.  The defendant was not allowed to impeach McDonald because of Mississippi's voucher rule, that a party may not impeach his own witness.  The Supreme Court held that exclusion of this critical evidence constituted a denial of due process.  Chambers, 410 U.S. at 302, 35 L. Ed. 2d at 313, 93 S. Ct. at 1049.  The Court recognized that declarations against penal interest are often motivated by extraneous considerations and, therefore, are not as inherently reliable as statements against pecuniary interest.  Nevertheless, the hearsay statements were made and offered under circumstances that provided considerable assurance of their reliability.  Chambers, 410 U.S. at 299-300, 35 L. Ed. 2d at 311-12, 93 S. Ct. at 1048.  Chambers mentioned some objective indicia of trustworthiness:  the statements were made spontaneously to a close acquaintance of the declarant shortly after the murder,

- 13 -

they were corroborated by other evidence, they were unquestionably against interest, and McDonald, who was present in court, could have been cross-examined by the State.

In the present case, the trial court cited People v. Craven, 54 Ill. 2d 419, 429, 299 N.E.2d 1, 6 (1973), for the proposition that "the presence of these objective indicia of trustworthiness are necessary for admissibility under the admission against penal interest exception," concluding that none of the required indicia were shown in this case. That approach is not correct. People v. Bowel, 111 Ill. 2d 58, 67, 488 N.E.2d 995, 999-1000 (1986). The four factors mentioned in Chambers "are merely guidelines to admissibility rather than hard and fast requirements; the presence of all four factors is not a condition of admissibility." People v. Tenney, 205 Ill. 2d 411, 435, 793 N.E.2d 571, 586 (2002). The question is rather whether the statement "was made under circumstances [that] provide 'considerable assurance' of its reliability by objective indicia of trustworthiness. [Citation.]" People v. Thomas, 171 Ill. 2d 207, 216, 664 N.E.2d 76, 81 (1996); see also Fed. R. Evid. 804(b)(3) (28 U.S.C. app. Fed. R. Evid. 804(b)(3) (2000)) ("corroborating circumstances clearly indicate the trustworthiness of the statement").

The declarant, in Chambers, would have been subject to cross-examination if the defendant had been allowed to question

him about the statement.  Nevertheless, availability of the declarant for cross-examination is not an absolute requirement. Our supreme court, in Tenney, held that it was reversible error to refuse to admit the hearsay statement, even though the declarant was not available for cross-examination.  Tenney, 205 Ill. 2d at 439-40, 793 N.E.2d at 588-89.  Our supreme court had addressed the issue even before Chambers:  "[I]t would be absurd, and shocking to all sense of justice, to indiscriminately apply such a rule to prevent one accused of a crime from showing that another person was the real culprit merely because that other person was deceased, insane[,] or outside the jurisdiction of the court."  People v. Lettrich, 413 Ill. 172, 178, 108 N.E.2d 488, 492 (1952).  Although the State would not have been able to cross-examine Williams at defendant's trial, because Williams was currently awaiting his own trial and probably would have exercised his privilege against self-incrimination, the State chose the order of trials.  Even though the State would have been unable to cross-examine Williams at trial, the police were able to thoroughly question Williams when they took the videotaped confession defendant sought to admit.

In Chambers, the confession was made spontaneously to a close acquaintance shortly after the crime occurred.  The present case involves a videotaped confession to the police.  "A statement made to a law[-]enforcement officer may be made in an

- 15 -

attempt to curry favor and obtain a reduced sentence; it may also be the product of coercion or force and be involuntary. Such a statement might not be as reliable as a statement made to a good friend or [a] family member." Tenney, 205 Ill. 2d at 438-39, 793 N.E.2d at 588. Sometimes, however, statements made to police officers in response to structured questioning may be more reliable than casual statements supposedly made to acquaintances. Statements to police officers while in custody have been admitted in a number of cases. See, e.g., People v. Human, 331 Ill. App. 3d 809, 817, 773 N.E.2d 4, 11 (2002).

> "The court in Chambers concluded a statement
> to a close friend was more likely to be
> trustworthy; here the statements of Andy and
> Spreitzer made to a State's Attorney and
> police officers while in custody were more
> likely trustworthy because they tended to
> intensify police efforts to prosecute Andy
> and Spreitzer. Like the declarant in
> Chambers, neither Andy nor Spreitzer stood to
> benefit by disclosing his role in the
> offenses, and each 'must have been aware of
> the possibility that disclosure would lead to
> criminal prosecution.'[Citation.]" People v.
> Kokoraleis, 149 Ill. App. 3d 1000, 1020-21,

501 N.E.2d 207, 221 (1986).

The same appears true in this case. Williams did not stand to profit by admitting his dominant role in this crime. Although the State appeared to have clear evidence of Williams' guilt, his confession increased the likelihood of a more severe sentence. Williams was arrested the day the crime occurred, on May 22, 2005, and made his videotaped statement that same day. Because the statement was made so shortly after the crime occurred, it was not likely to be simply a "calculated statement[] made to a police officer." People v. Caffey, 205 Ill. 2d 52, 98, 792 N.E.2d 1163, 1193 (2001).

The State argues that "Williams' attempt to deny defendant's involvement was not directly against Williams' penal interest." The cases the State cites in support of that proposition, however, did not involve a situation like the situation of our case. Instead, they involved the converse situation, where the State attempted to use a declarant's self-inculpatory statement, not against the declarant himself, but against a codefendant. In Williamson, Harris told police that he was transporting drugs for Williamson. Harris refused to testify at Williamson's trial, but his statement was admitted under Rule Fed. R. Evid. 804(b). The Supreme Court reversed. "The district court may not just assume for purposes of Rule 804(b)(3) that a statement is self-inculpatory because it is part of a fuller

confession, and this is especially true when the statement implicates someone else." Williamson v. United States, 512 U.S. 594, 601, 129 L. Ed. 2d 476, 483, 114 S. Ct. 2431, 2435 (1994). "'[T]he arrest statements of a codefendant have traditionally been viewed with special suspicion. Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence.'" Williamson, 512 U.S. at 601, 129 L. Ed. 2d at 483, 114 S. Ct. at 2435, quoting Lee v. Illinois, 476 U.S. 530, 541, 90 L. Ed. 2d 514, 526, 106 S. Ct. 2056, 2062 (1986). The strict requirements imposed on hearsay statements which inculpate the defendant were designed to satisfy confrontation-clause concerns, but the confrontation clause protects defendants, not prosecutors. When a defendant attempts to use an exculpatory statement it is not necessary that the declarant confess to the exact crime for which the defendant is on trial. People v. Turner, 373 Ill. App. 3d 121, 125, 866 N.E.2d 1215, 1219 (2007). A declaration against penal interest is simply "one that would be admissible against the declarant in a criminal prosecution; it need not be a confession, but must involve exposure to criminal liability." Tenney, 205 Ill. 2d at 436, 793 N.E.2d at 587.

It is true that the fact that a statement contains some incriminating material may not justify admission of the entire

statement, particularly where the statement is used to inculpate rather than exculpate the defendant. However, a declarant's statement that he committed the crime is the classic example of a statement against penal interest, even though the logical import of the statement is that defendant did not commit the crime. In the Williams case cited by the State, defendant Bobby O. Williams' request to admit the statement of Simpson, that "Fred" shot a convenience-store clerk, was properly denied even though Simpson admitted that he drove "Fred" to the convenience store for the purpose of committing a robbery. The statement did not really inculpate Simpson; rather, it was overwhelmingly exculpatory. "[B]ecause these statements were self-exculpatory, they were properly found inadmissible, despite their connection to Simpson's other, self-inculpatory statements." People v. Williams, 193 Ill. 2d 1, 23, 737 N.E.2d 230, 243 (2000).

The present case does not involve the "bogus-confession" situation exemplified by People v. Tate, 87 Ill. 2d 134, 137-39, 429 N.E.2d 470, 472-73 (1981). In Tate, "a close friend of defendant['s]" testified a third party had told him that the third party had been the robber but at trial the third party denied the statement. Tate, 87 Ill. 2d at 139, 429 N.E.2d at 473. There is no doubt in this case that Williams made the statement in question. When the statement is made to a police officer, we are not forced to rely upon "a close friend of

defendant['s]" to determine whether the statement was made or its exact language. In the present case, we are not even forced to rely upon the testimony of a police officer. There is a videotape. The State does not dispute that much of what Williams said in the statement was true.

There clearly were corroborating circumstances here which indicate the trustworthiness of Williams' statement. Marlon Williams was later convicted of first degree murder, armed robbery, and home invasion. During Williams' appeal, the State argued that any disparity between his and defendant's sentences was warranted due to the extent of Williams' participation in the crime when compared to defendant's participation. Although his videotaped statement was not played for the jury, prosecutors cross-examined Williams with portions of his confession which exculpated defendant. It is anomalous for the State to oppose admission of a declarant's hearsay statement for defendant when the State uses the same evidence to convict the declarant. Tenney, 205 Ill. 2d at 440, 793 N.E.2d at 589. If evidence "'is sufficiently reliable for prosecutorial use, the state cannot claim that it is too unreliable when offered by the defendant.'" Tenney, 205 Ill. 2d at 440, 793 N.E.2d at 589, quoting Pettijohn v. Hall, 599 F.2d 476, 481 (1st Cir. 1979). In Tenney, the State had already used the statement in Lane's trial when it objected to defendant's use of the statement in his trial. Tenney, 205

Ill. 2d at 440, 793 N.E.2d at 588-89. That is not true in the present case, but the State had to have decided whether Williams' statement was reliable long before it used it in Williams' trial.

Williams' statement was further corroborated by the surviving victim, Ryan, who told police that only Williams did anything, that defendant did not do anything, that she could tell defendant did not want to be there and wanted to leave, and defendant "was the reason why [she] was still alive." Ryan changed her account at trial, which defendant argues resulted from her perception that the police regarded her as a suspect. The jury should have been allowed to decide which version was true. Corroboration does not require that the judge be completely convinced that exculpatory statements are true prior to their admission. The judge must find only that sufficient corroborating circumstances exist and then permit the jury to make the ultimate determination concerning the truth of the statements. Tenney, 205 Ill. 2d at 437, 793 N.E.2d at 587. "'If the issue of sufficiency of *** corroboration is close, the judge should favor admitting the statement. In most such instances, the good sense of the jury will correct any prejudicial impact.'" Tenney, 205 Ill. 2d at 437, 793 N.E.2d at 587, quoting Commonwealth v. Drew, 397 Mass. 65, 75 n.10, 489 N.E.2d 1233, 1241 n.10 (1986).

As in Tenney, we cannot say that the exclusion of

- 21 -

Williams' hearsay statement did not affect the outcome of defendant's trial. Tenney, 205 Ill. 2d at 441, 793 N.E.2d at 589. Defendant argued the testimony that he had spoken of robbing Blondeel before the offense was confused and conflicting, and that Williams unexpectedly became violent. Defendant argued that he feared Williams would kill him, as Williams had killed Blondeel, if he ran from the crime scene, did not follow Williams' directions, or did not take part of the money to indicate he would not inform on Williams. As the State points out, even without Williams' statement, all of the prosecution's evidence showed that Williams, and not defendant, had stabbed Blondeel. "From this evidence, the jury could have inferred the facts supporting defendant's case. However, this inference was no substitute for [the] confession, which would have provided crucial substantiation of defendant's asserted defense." Tenney, 205 Ill. 2d at 441, 793 N.E.2d at 589. "[T]he exclusion of such evidence 'deprived appellant of crucial substantiation of his asserted defense ***. *** As a result, his case was "far less persuasive than it might have been."'" Tenney, 205 Ill. 2d at 441, 793 N.E.2d at 589, quoting United States v. Benveniste, 564 F.2d 335, 341-42 (9th Cir. 1977), quoting Chambers, 410 U.S. at 294, 35 L. Ed. 2d at 308, 93 S. Ct. at 1045.

Although the outcome of this case may have been different if Williams' videotaped statement had been admitted,

- 22 -

and the error in refusing to admit the statement was not harmless, the evidence was sufficient to prove defendant guilty beyond a reasonable doubt.  We therefore find that there is no double jeopardy impediment to a new trial.

### III. CONCLUSION

For the aforementioned reasons, we reverse and remand the trial court's judgment for a new trial in accordance with our decision in this case.

Reversed and remanded.

MYERSCOUGH and KNECHT, JJ., concur.