2019 IL App (2d) 140871
No. 2-14-0871
Opinion filed March 25, 2019

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) ) | |
| v. | ) ) | No. 13-CF-655 |
| JOSE REBOLLAR-VERGARA, | ) ) ) | Honorable Daniel B. Shanes, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BURKE delivered the judgment of the court, with opinion.
Justice Jorgensen concurred with the judgment and opinion.
Justice Jorgensen also specially concurred, with opinion.
Justice McLaren dissented, with opinion.

**OPINION**

¶ 1    A jury found defendant, Jose Rebollar-Vergara, guilty of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2012)), based on acts committed with his codefendant, Jose Garcia, who fatally shot Gabriel Gonzalez outside a convenience store.

¶ 2    On direct appeal, defendant requests a new trial to remedy three errors: (1) the State violated his right to due process by securing an indictment supported by misleading testimony that he flashed "gang signs" at Gonzalez and "confessed" to the police, (2) Garcia's statement that defendant should not be charged with murder was an admission against penal interest that was erroneously excluded, and (3) the State repeatedly misstated during closing argument that

Garcia held the position of "security" in the Latin Kings street gang. Defendant also disputes the sufficiency of the evidence. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Many of the underlying facts are no longer in dispute. Gonzalez was shot to death outside the One Stop Food & Liquor convenience store in Round Lake Beach at about 12:40 a.m. on March 10, 2013. He had one gunshot wound in his back. Ten shell casings were found in the parking lot.

¶ 5     Silvia Saavedra was hosting a house party on the night of the shooting. Her boyfriend, Francisco Acevedo, was there with defendant, Garcia, and others. Defendant, Garcia, and an acquaintance, whom defendant identified as "Andrew," left the party and walked to the store, which was equipped with a 13-camera surveillance system. The cameras were recording areas inside and outside the store that night. Defendant has consistently denied knowing that Garcia had a gun with him.

¶ 6     Defendant, Garcia, and Andrew walked to the beer cooler in the rear of the store. Gonzalez entered the store and went to the counter to purchase a loose cigarette. Defendant, Garcia, and Andrew walked to the counter. Defendant and Garcia briefly exchanged words with Gonzalez. Defendant told a police officer during a video-recorded interview that he was a member of the Lawrence and Kedzie branch of the Latin Kings street gang when he lived in Chicago but that he was no longer involved with the gang. Defendant also said that he recalled fighting Gonzalez in a bar a year or two before the shooting and thought that Gonzalez might have been a member of a rival gang, the Maniac Latin Disciples (MLD), based on the way he was wearing his baseball cap on the night of the shooting.

¶ 7    The store's surveillance video shows Gonzalez backing out of the store and continuing backward across the parking lot, tipping his cap toward defendant and Garcia, who followed him. Defendant and Garcia exchanged trash talk with Gonzalez, while Andrew lingered a few yards away. Defendant told a police officer that he exited the store intending a fist fight with Gonzalez but that he heard gunshots instead. Garcia had fired several shots at Gonzalez. Defendant, Garcia, and Andrew ran from the scene before the police arrived.

¶ 8    Garcia was arrested and confessed to shooting Gonzalez. He told the police, "I just shot him, I kept doing it, but I didn't know I was actually hitting him." Garcia was convicted of first-degree murder in a separate trial and sentenced to 62 years' imprisonment. Andrew was never charged.

¶ 9    The State's theory of the case was that defendant was accountable for Garcia's conduct. "Accountability is not a crime in and of itself but, rather, a mechanism through which a criminal conviction may result." *People v. Pollock*, 202 Ill. 2d 189, 210 (2002). A defendant is legally accountable for another person's criminal conduct when "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2012). To establish that a defendant intended to promote or facilitate a crime, "the State may present evidence that either (1) the defendant shared the criminal intent of the principal, or (2) there was a common criminal design." *People v. Fernandez*, 2014 IL 115527, ¶ 13. "Under the common-design rule, if 'two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts.' " *Fernandez,*

2014 IL 115527, ¶ 13 (quoting *In re W.C.*, 167 Ill. 2d 307, 337 (1995)).

¶ 10    The State's position was that defendant and Garcia acted with a common criminal design, and, to establish defendant's accountability, it relied on his statement that he exited the store with the intent to fight Gonzalez when Garcia shot him.  The State also cited evidence that defendant and Garcia were Latin Kings, with Garcia allegedly serving in the role of security for the gang.  Defendant and Garcia allegedly acted with the belief that Gonzalez was a member of a rival gang.

¶ 11                    A. Motions to Dismiss Indictment

¶ 12    The State presented to a grand jury the testimony of Officer Kenneth Maier of the Village of Vernon Hills Police Department and the Lake County Major Crimes Task Force.  Through a series of leading questions by an assistant state's attorney (ASA), Officer Maier testified that he had learned that defendant, Garcia, and Gonzalez had been at the store at 12:40 a.m. on March 10, 2013.  While Gonzalez was at the counter, either defendant or Garcia walked up to him and said "fix your s\*\*\*, Disciple."  Officer Maier learned that the statement was a reference to Gonzalez[1] wearing his cap in a way that indicated he was a member of the Gangster Disciples, who sometimes are known as MLDs.  Officer Maier learned that defendant and Garcia were members of the Latin Kings, but that Gonzalez had no gang affiliation.

¶ 13    Officer Maier affirmed that, at some point, defendant and Garcia began arguing with Gonzalez.  As Gonzalez began to walk out of the store, either defendant or Garcia started flashing gang signs at him.  Gonzalez walked backward across the parking lot, and defendant and Garcia followed him outside, flashing gang signs and arguing with him.

---

[1] The transcript shows that, at this point, the ASA meant to specify Gonzalez as the person wearing the hat but that he misspoke, referring to defendant.

¶ 14    According to Officer Maier, Garcia drew a handgun and began shooting at Gonzalez, who turned and ran as soon as he saw the gun.  Garcia fired 10 shots, and one struck Gonzalez in the back, rupturing his aorta.  Gonzalez took two steps and fell to the ground, where he died. Officer Maier testified that defendant and Garcia were arrested the day after the murder.  The grand jury was not shown the video recordings from the surveillance system.

¶ 15    On April 24, 2013, defendant and Garcia were indicted on three counts of first-degree murder (720 ILCS 5/9-1(a)(1), (a)(3) (West 2012)).  On September 9, 2013, defendant, who was represented by the Lake County public defender's office at the time, filed a motion to dismiss the indictment, arguing, *inter alia*, that the State had presented perjured testimony to the grand jury, based on the following exchange between the ASA and Officer Maier:

> "Q. Subsequently the two defendants were arrested?
>
> A. Yes.
>
> Q. And they did make confessions, is that correct?
>
> A. Yes."

The motion alleged that defendant "has been prejudiced because of perjured testimony which alleged that defendant had confessed to the crime, specifically that he was aware of or participated in the shooting."  The motion argued that "[t]his perjured testimony is particularly prejudicial to the defendant because there was no other evidence presented to the grand jury that the defendant had any involvement in the shooting.  Nor is there anything tendered in discovery that would indicate that defendant had any knowledge that a shooting was going to occur. Defendant's statement denied any knowledge that a shooting was going to occur.  Moreover, Garcia (codefendant) indicated in his statement that he was solely responsible for the shooting."

¶ 16    The next day, on September 10, 2013, defendant filed a supplemental motion to dismiss the indictment.   The motion amplified the allegation of perjured testimony, based on the following colloquy before the grand jury:

"Q. And as the victim began to walk out of the One Stop Food And Liquor, one of the defendants started flashing gang signs at him?

A. Yes.

* * *

Q. And the defendants are following the victim out of the store flashing gang signs and arguing with him, is that correct?

A. Yes."

¶ 17    To show the trial court that defendant had neither confessed nor flashed gang signs at Gonzalez, the defense presented segments of a video-recorded police interview of defendant before he was charged.[2]   In the first segment, defendant said that he was no longer "gangbanging."   When Officer Paul Grace told him, "I don't think that you knew that this was going to happen," defendant replied, "I didn't even know what the f*** happened."   According to defendant, he showed up at the store and saw "that one guy," referring to Gonzalez.   They were going to fight; defendant followed him outside, and Gonzalez "started talking s***" and "called [defendant] out."   Next, "out of nowhere, when I was just butting up with him, you know, I was about to fight him and s*** and out of nowhere: pow, pow, pow."   Defendant then "took off."

_____

    [2] Transcripts of the interview were not yet available at the time of the hearing.  This court has had access to both the recording of the interview and the transcripts later used at trial.

¶ 18    When asked to "start from the beginning," defendant said that he went to the store for beer. He walked out and saw "that kid." Defendant and Gonzalez had "probably went at it" in the past, and they started arguing. Defendant insisted that he was no longer in a gang and did not know if Gonzalez was in a gang. Gonzalez was talking trash but was not throwing gang signs. Defendant and Gonzalez "exchanged words."

¶ 19    Defendant stated that he went to the store by himself. When told that the police had already talked to Acevedo and knew that defendant was in a group of three, defendant insisted that he was telling the truth. There was "a fight," and defendant did not know what happened after that. Defendant took off because he had been shot before and did not want to get shot again. When asked if Acevedo would be lying if he said that defendant pulled the trigger, defendant replied, "Why would he say that? Like I said, you seen [*sic*] the video. I ain't have [*sic*] no weapon in my hands. I wasn't d*** near no weapons." Defendant explained, "I'm dealing with my own f*** s*** right now. For me to f*** it up." He claimed that he "only just probably met" the man who was with him that night, presumably referring to Garcia. "I don't even know him like that."

¶ 20    Defendant stated that he walked from a girl's house to the store to buy beer. His "buddy," again presumably Garcia, did not enter the store. Gonzalez was already inside. He and Gonzalez did not argue inside the store, but he conceded that they were "talking trash" outside. He and Gonzalez had been involved in a bar fight the year before. Defendant could not say specifically what he and Gonzalez said to each other before the shooting, except that Gonzalez gave defendant a dirty look, called defendant "Lawrence Kings," and said "King Killer."

¶ 21    Both defendant and Garcia were tipsy, although he did not know what Garcia was on, because "[t]hat was the first time [he] met that kid." Defendant told the officers that he expected

to fight Gonzalez "one-on-one," because someone else joining in would have made it a "dirty fight." Defendant kept stepping toward Gonzalez as Gonzalez backed away, and the two trash talked. Defendant thought that Garcia did not know Gonzalez. Defendant was surprised to hear the gunshots, and he was afraid he might get struck.

¶ 22 In the next segment, defendant said that he was at a party with Garcia, whom he called "Lil' Max," who eventually shot Gonzalez at the store. When asked if he was "cool" with Garcia, defendant said "I don't even know him like that" and "all I seen [*sic*] him around a couple of times." Defendant agreed with Officer Grace's statement that he did not think that "you guys went there to do this. I believe that you went there to get some more, some more drinks. You're going to have a good time. You're an adult." Defendant also agreed with Officer Grace's statement that "this kid went overboard with it. You wanted to box that dude. *** When you went there, it was pretty much, listen I want nothing to do with, with shooting him and all that crazy stuff. I'll box. I'll take my lumps if I lose but that's that."

¶ 23 When asked where Garcia got the gun, defendant stated that he did not know. Defendant never saw the gun and did not know that Garcia had it with him. Defendant "was trying to fight the guy; all I heard was pow, pow. That's it." Defendant was not sure where Garcia was when he was shooting, as defendant "wasn't even paying attention to any of that" and was focused on fighting. Defendant was sure that it was not Andrew who shot Gonzalez, and Officer Grace wanted to talk to Andrew so that he could confirm that "you guys didn't go there with the intention of doing this." Defendant consented to the officers entering his house to seize his cell phone, which contained Andrew's phone number.

¶ 24 Defendant told the police that, after the shooting, he ran back to Saavedra's house. Garcia arrived around the same time. Defendant did not have any conversation with Garcia

afterward and "didn't even know if he like hit him or anything." Defendant did not know if Garcia got rid of the gun or still had it. He thought that Garcia was still at Saavedra's house when defendant left at about 2:30 a.m. Defendant did not know Garcia's whereabouts at the time of the interview.

¶ 25 Defendant was "thinking" that he and Gonzalez had fought previously. He recognized him in the store and "probably" said "Disciple" to him, but defendant was drunk. He thought that Gonzalez was an MLD, based on "[h]is hat and everything." Defendant admitted telling him to "fix your s***," but, according to defendant, "It wasn't even gangbanging." Defendant and Gonzalez exchanged words, and there was "a lot of trash talking."

¶ 26 The trial court then viewed a five-minute segment of the police interview of Garcia. At one point, Garcia said, "F*** it man. You know what? Imma tell you what happened. *** Yeh, that was me, man. But I didn't meant [*sic*] to kill dude. I never thought he was shot. I never thought he died to [*sic*] yesterday." Garcia had pulled out his gun only to scare Gonzalez; he aimed his gun at the ground and shot it. He did not know Gonzalez, but Gonzalez was "talking s***" and "mouthing off" to "K.G.," defendant, in the store. They started arguing outside. The shooting was not planned. It "just happened" and was an "accident."

¶ 27 After a long conversation about what happened to the gun, Garcia stated that he did not know Andrew. The following colloquy then occurred:

"GARCIA: You got it man. Now, you already got what happened. Why, I, on everything, point, how, why I f*** up, f*** dude died. Now, I, now I just want to get my sentence, man.

OFFICER SEELEY: So, what about, so [defendant] didn't have anything to do with this? So, he should—

GARCIA:  Naw.

OFFICER SEELEY:  Should he get charged with this?

GARCIA:  No.

OFFICER SEELEY:  This is you?  This is on you?

GARCIA:  Me.

OFFICER SEELEY:  This is nothing Latin King?  This is you?

GARCIA:  Nothing.  It's me.  [Defendant] shouldn't get charged with s***.

OFFICER GAUGHAN:  What about [Acevedo]?

GARCIA:  Naw.  Nobody.  Nobody should."

¶ 28    The trial court also viewed surveillance video of defendant, Garcia, and Gonzalez inside and outside the store and at the time of the shooting.

¶ 29    On September 16, 2013, the trial court denied the original and supplemental motions to dismiss the indictment.  Citing the video recordings of the statements by defendant and Garcia, as well as the grand jury transcript, the court summarized the evidence presented to the grand jury.  Defendant and Garcia went to the store, encountered Gonzalez, and trash talked.  Either defendant or Garcia made gang references, and defendant followed Gonzalez outside with the intent to fight him.  Garcia walked with defendant outside and shot Gonzalez.

¶ 30    The trial court commented that, although "[t]he way some of the questions were asked is not exactly a model of clarity," there was "sufficient probable cause before the grand jury to return an indictment for murder against [defendant] if not as principal, certainly as an accomplice."  Emphasizing the "extremely limited" scope of review of grand jury proceedings, the trial court found that, even if the challenged testimony were excised, the remaining evidence supported the indictment.

¶ 31   On March 10, 2014, defendant, through a private attorney, filed another motion to dismiss the indictment. The motion alleged that Officer Maier falsely testified that defendant and Garcia each stated that defendant was accountable for the offense committed by Garcia. On appeal, defendant does not mention the motion or any ruling associated with it.

¶ 32                    B. Garcia's Statements on Accountability

¶ 33   On March 4, 2010, defendant filed a motion to admit Garcia's statements to the police that (1) Garcia shot Gonzalez and (2) only Garcia, and not defendant, should be charged for the shooting. Defendant argued that the statements were admissible because Garcia made them against his penal interest and they showed that defendant was not accountable for the murder.

¶ 34   The trial court admitted Garcia's statement that he was the shooter, but the court excluded the statement that defendant should not be charged. The court observed that the State, not Garcia, was responsible for deciding whether defendant should be charged. The court found Garcia's opinion to be irrelevant and unhelpful to a trier of fact responsible for determining defendant's guilt or innocence.

¶ 35                    C. Trial Evidence Regarding Accountability

¶ 36   The jury heard overwhelming evidence of the underlying facts. Defendant and Garcia walked to the convenience store, encountered Gonzalez at the counter, and trash talked. Defendant and Garcia quarreled with Gonzalez as he backed out of the store and across the parking lot. Defendant admitted that he wanted a "one-on-one" fistfight with Gonzalez, but Garcia shot him first. The trial turned on whether defendant was accountable for Garcia's conduct, which the State attempted to show with evidence that defendant and Garcia were acting with a common criminal design to harm Gonzalez, motivated by Gonzalez's disrespect to them and their gang.

¶ 37    Monged Asad, the owner of the store, testified over defense objection that he had found graffiti on his building several times over the past six years. Mohammad Asad, Monged's brother, testified that he was working at the store at the time of the shooting. Mohammad confirmed that Gonzalez was at the counter when defendant, Garcia, and a third person approached and began arguing with Gonzalez.

¶ 38    Amanda Buerer testified that she stopped at the store with her boyfriend, Dakotah Beeter, who walked to the cooler in the rear of the store. Buerer let Gonzalez go ahead of her in line at the counter, and three men approached. Buerer heard the word "disciple" being directed at Gonzalez, and she heard defendant say "I don't do disciples." Buerer did not hear Gonzalez say anything. Beeter testified that he looked out the store window and saw a man in a red and black hoodie, identified as Garcia. The man raised his arm in the direction of Gonzalez. After the shots were fired, Gonzalez walked toward the store. Beeter opened the door and asked if he was all right, but Gonzalez fell to the ground.

¶ 39    Saavedra testified that she and Acevedo went to bed around 10 p.m. on the night of the shooting and that she did not know who else was in the house. When she woke up around 10 a.m. the next day, Acevedo and Garcia were there. Saavedra previously had testified that she awoke around 1 a.m. and saw defendant and Garcia in the house.

¶ 40    Round Lake Beach police officer Tim Schuster testified that he viewed the surveillance video and recognized defendant. In 2012, Officer Schuster had two contacts with defendant, and each time defendant was with Garcia and Acevedo.

¶ 41    A redacted version of Officer Grace's interview of defendant was played for the jury, and the jury was provided a transcript. In the interview, defendant admitted that he argued with and intended to fight Gonzalez but that someone came out of nowhere and shot him first. Defendant

denied gangbanging or knowing that Garcia had a gun. However, defendant admitted prior membership in the Lawrence and Kedzie Latin Kings and that he thought Garcia was a Latin King but was not sure. Defendant also admitted to Officer Grace that he thought Gonzalez might have been an MLD, because of the way he wore his hat. Defendant admitted that he might have said "disciple" and "fix your s***" to Gonzalez when they were standing at the counter.

¶ 42 Over defendant's objection, Mundelein police officer Jakob Anderson was qualified as an expert in the field of gang enforcement and intelligence. Officer Anderson testified about the two rival nations of gangs in the Midwest: the People, which include the Latin Kings, and the Folk, which include the MLDs. Within each gang is a hierarchy consisting of someone in charge of the day-to-day operations, an enforcer, someone in charge of money, a secretary, and security. A new member starts at the bottom and moves up by completing tasks or reacting to a rival gang's disrespect. The Latin Kings represent to the left with their clothing, jewelry, and tattoos, and the MLDs represent to the right. The number five is significant to the Latin Kings, and six is significant to the MLDs. Gangs have territories, and passing into rival gang territory shows disrespect that could provoke a fistfight or a shooting. Gangs use graffiti.

¶ 43 The Latin Kings display black and gold or black and red colors. Their common symbols are a crown, a five-point star, five dots, and a male lion's face. Their hand signal is a three- or five-point crown. Their primary activities are drug dealing, prostitution, and gun selling. Lawrence and Kedzie is a subset of the Latin Kings in Chicago, and there are Latin Kings in Round Lake Beach.

¶ 44 Officer Anderson testified that he and Garcia had discussed Latin Kings activity several times over eight years. Officer Anderson identified photos of Garcia's tattoos, including the word "Garcia" with a five-point star above the "i," five dots, and a five-point crown on his left

hand. On his calf, Garcia had an upside-down pitchfork to signify disrespect to the Folk nation. Officer Anderson was shown surveillance video from inside the store and identified Garcia flashing a Latin Kings hand signal.

¶ 45 Officer Anderson admitted that he did not know defendant and had never spoken to him. Officer Anderson testified that defendant displayed Latin Kings tattoos, including the letters "LK," a five-point crown, a lion's face with a five-point crown, and five dots, but he did not know when defendant got the tattoos. The officer identified a photograph of defendant flashing a hand signal of an upside-down pitchfork. He also identified a photograph of defendant and Acevedo flashing three-point crowns and Acevedo flashing an upside-down pitchfork. The court did not allow the photographs to be published to the jury. Officer Anderson did not see defendant flashing any gang signs in the surveillance video.

¶ 46 Officer Anderson opined, based on his training, experience, street contacts, and discussions with other officers, the surveillance video, the photographs, and Officer Grace's report, that defendant and Garcia were affiliated with the Latin Kings at the time of the shooting.

¶ 47 Officer Anderson conceded that there are ways to become unaffiliated with a street gang and that he was aware that defendant told the police that he was no longer involved with the gang. A member can be "jumped out" of a gang by submitting to a beating or a gunshot wound. A member also can move out of the area to remove himself from the gang. Throughout this testimony, the trial court repeatedly admonished the jury that the evidence was being offered for the limited purpose of showing how Officer Anderson formed his opinion.

¶ 48 The jury found defendant guilty of first-degree murder and also found that, during the commission of the offense, defendant, or one for whom he was legally responsible, was armed

with a firearm. The court sentenced defendant to 38 years' imprisonment. This timely appeal followed.

¶ 49                                    II. ANALYSIS

¶ 50    Defendant argues that he is entitled to a new trial, based on three errors. First, he claims that the State violated his right to due process by securing an indictment supported by misleading testimony that he "confessed" to the police and flashed gang signs at Gonzalez. Second, he argues that Garcia's statement that defendant should not be charged was admissible as an admission against penal interest. Third, he contends that the State repeatedly misstated during closing argument that Garcia held the position of "security" in the Latin Kings. Defendant also requests an outright reversal of the conviction for lack of proof beyond a reasonable doubt.

¶ 51                                    A. Indictment

¶ 52    Defendant first contends that his right to due process was violated when the State used inaccurate and misleading testimony to obtain the indictment for first-degree murder. Defendant concedes that Garcia confessed to the shooting and that Garcia flashed gang signs as he argued with Gonzalez. But defendant argues that, at the hearing on his motions to dismiss the indictment, he presented adequate evidence to corroborate his denials that he confessed or flashed gang signs himself.

¶ 53    Defendant raised the issue in his motions to dismiss the indictment but failed to raise it in his posttrial motion, which ordinarily would result in forfeiture of his argument. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). However, an alleged due process violation is a constitutional issue that, if raised at trial, is reviewable. See *People v. Cregan*, 2011 IL App (4th) 100477, ¶ 16. Under the circumstances of this case, we view the use of allegedly false or misleading

testimony before the grand jury as an allegation of a due process violation worthy of consideration.

¶ 54    The trial court based its ruling in favor of the indictment on the transcripts of the testimony before the grand jury, portions of the surveillance video, and the video-recorded statements of defendant and Garcia.[3] There is no dispute as to the contents of these documents; thus, we review *de novo* whether defendant was denied due process and, if so, whether that denial was prejudicial. *People v. Oliver*, 368 Ill. App. 3d 690, 695 (2006).

¶ 55    The grand jury's role is to determine whether probable cause exists that a person has committed a crime, which would warrant a trial; prosecutors advise the grand jury by informing it of the proposed charges and the pertinent law. *People v. Legore*, 2013 IL App (2d) 111038, ¶ 23. In general, a defendant may not challenge the validity of an indictment returned by a legally constituted grand jury. *Legore*, 2013 IL App (2d) 111038, ¶ 23.

¶ 56    However, a trial court has the inherent authority to dismiss an indictment where there has been a prejudicial denial of due process. *People v. Lawson*, 67 Ill. 2d 449, 456 (1977). A prejudicial denial of due process can occur where an indictment is procured through prosecutorial misconduct. *Legore*, 2013 IL App (2d) 111038, ¶ 23. " 'The due process rights of a defendant may be violated if the prosecutor deliberately or intentionally misleads the grand jury, uses known perjured or false testimony, or presents other deceptive or inaccurate evidence.' " *Oliver*, 368 Ill. App. 3d at 694 (quoting *People v. DiVincenzo*, 183 Ill.2d 239, 257 (1998)). To warrant dismissal of the indictment, the denial of due process must be unequivocally clear, and the prejudice must be actual and substantial. *Oliver*, 368 Ill. App. 3d at 694-95.

---

[3] The grand jury was not shown either the surveillance video or the video-recorded statements.

Prosecutorial misconduct resulting in a due process violation is actually and substantially prejudicial only if the grand jury would not have otherwise indicted the defendant. *Legore*, 2013 IL App (2d) 111038, ¶ 23. A defendant must establish that the contested testimony was so deceptive or inaccurate that it affected the grand jury's deliberations. *People v. Holmes*, 397 Ill. App. 3d 737, 742 (2010).

¶ 57 In this case, Officer Maier answered "yes" to several questions that allegedly conveyed to the grand jury that defendant "confessed" and flashed gang signs at Gonzalez. The two sets of questions were: (1) "Subsequently the two defendants were arrested?" and "[T]hey did make confessions, is that correct?" and (2) "[A]s Gonzalez began to walk out of the [store], one of the defendants started flashing gang signs at him?" and "[T]he defendants are following Gonzalez out of the store flashing gang signs and arguing with him, is that correct?" Defendant concludes that the indictment should have been dismissed because the evidence presented at the hearing showed that defendant did not confess or flash gang signs and Officer Maier's contrary testimony improperly affected the grand jury's deliberations.

¶ 58 Officer Maier affirmed that "they did make confessions," and defendant argues that the grand jury could have interpreted the statement in only one way: defendant and Garcia each had confessed to the first-degree murder of Gonzalez. Defendant argues that the term "confession" was so "probative and damaging" that the grand jury would not have returned the indictment without it. This exaggerates the probative value of the statement while discounting the remaining evidence in support of the State's accountability theory.

¶ 59 Officer Maier's statement that defendant "confessed" was ambiguous and not necessarily false. Defendant defines "confession" as "a written or spoken statement in which you say that you have *done something wrong* or committed a crime." (Emphasis added.) Definitions of

"confess" include "to tell of or make known (something private, hidden, or damaging to oneself)" and "to admit as true; assent to; acknowledge, esp[ecially] after a previous doubt, denial or concealment." Webster's Third New International Dictionary 475 (1993).

¶ 60 Defendant claims that he, in fact, "did not confess to any involvement in the murder," but that assertion is refuted by defendant's acknowledgements during the police interview. Defendant's initiation and escalation of the confrontation is now undisputed since the police confronted him with the surveillance video during the interview. Defendant admitted that he was at the convenience store and was at least a former member, if not a current member, of the Latin Kings. Defendant admitted that he directed gang-related trash talk at Gonzalez, whom he identified as a rival gang member. Defendant also admitted that he followed Gonzalez into the parking lot with Garcia and intended a fistfight with Gonzalez while Garcia looked on.

¶ 61 Officer Maier also answered "yes" to the question "[T]he defendants are following Gonzalez out of the store flashing gang signs and arguing with him, is that correct?" Defendant argues that the statement was misleading because the surveillance video, which the grand jury did not view, does not show him flashing gang signs. However, defendant admitted during his police interview that he argued with Gonzalez as they exited the store. Furthermore, the challenged statement was immediately preceded by the officer affirming that, "as the victim began to walk out of the [store], one of the defendants started flashing gang signs at him." The surveillance video shows Garcia flashing gang signs at Gonzalez, which is not inconsistent with the officer's grand jury testimony. Thus, defendant has not shown an "unequivocally clear" due process violation. *Oliver*, 368 Ill. App. 3d at 694-95.

¶ 62 More importantly, even if Officer Maier's affirmations regarding "confessions" and who flashed gang signs were inaccurate, we conclude that they did not cause "actual and substantial"

prejudice. *Oliver*, 368 Ill. App. 3d at 694-95. "[A] due process violation consisting of prosecutorial misconduct before a grand jury is actually and substantially prejudicial only if without it the grand jury would not have indicted the defendant." *Oliver*, 368 Ill. App. 3d at 696-97. Prejudice is shown if the evidence was so weak that the misconduct induced the grand jury to indict. *Oliver*, 368 Ill. App. 3d at 697-98.

¶ 63    The validity of the indictment did not turn on whether defendant explicitly "confessed" to being accountable for Garcia's conduct or flashed gang signs at the victim. The grand jury heard detailed evidence that defendant and Garcia were fellow gang members who jointly confronted and aggressively pursued Gonzalez, who they thought was a rival gang member. From these facts, we cannot say that "without [the complained-of testimony] the grand jury would not have indicted the defendant." See *Oliver*, 368 Ill. App. 3d at 696-97. The remaining evidence supported the grand jury's determination of probable cause based on defendant's actions.

¶ 64    The dissent "submit[s] that the majority distorts and minimizes the distinction between a confession and an admission and displays an indifference to the substantial and presumptive effect of guilt associated with a 'confession.' " *Infra* ¶ 115. We do not quarrel with the definition of confession as " 'a direct acknowledgement of guilt on the part of the accused, either by a statement of the details of the crime or an admission of the ultimate fact.' " *Infra* ¶ 116 (quoting *People v. Nitti*, 312 Ill. 73, 92 (1924)). Putting aside that our supreme court has defined "confession" in terms of an "admission," we respectfully disagree that the officer's affirmation of the word "confession" was presumptively prejudicial and reversible error. Prosecutors advise the grand jury by informing it of the proposed charges and the pertinent law (*Legore*, 2013 IL App (2d) 111038, ¶ 23), and, under different facts, testimony about a confession that did not occur certainly can be misleading and reversible. But the dissent cites no authority for the

proposition that a grand jury must be advised on the distinction between a confession and an admission when those terms arise in testimony. Nor does it explain why, in the absence of such an instruction, we should presume that the grand jury believed that a "confession" was an acknowledgement of guilt beyond a reasonable doubt and not an acknowledgement of facts that supported a finding of guilt beyond a reasonable doubt or even probable cause that defendant committed the offense.

¶ 65    The ASA used the term "confessions" once, without explaining its meaning or what words were spoken to make the officer believe that a confession had been made. The ephemeral testimony does not support the dissent's characterization of it as "the most powerful piece of evidence" against defendant. (Internal quotation marks omitted.) *Infra* ¶ 119.

¶ 66    The dissent cites several cases to illustrate the "staggering effect that tales of a 'confession' can have on jurors" (*infra* ¶ 119), but this case is distinguishable from those, where the jurors heard detailed descriptions of statements by the accused. For instance, in *Arizona v. Fulminante*, 499 U.S. 279, 283 (1991), the jury learned that the accused had given a confession, later shown to be coerced, that he had driven Gonzalez to the desert on his motorcycle, choked her, sexually assaulted her, and made her beg for her life, before shooting her twice in the head. In *Evans v. United States*, 375 F.2d 355, 359 (8th Cir. 1967), *rev'd sub nom Bruton v. United States*, 391 U.S. 123 (1968), a postal inspector testified that the accused orally "described his participation in the robbery in some detail and implicated [his codefendant] as his accomplice." In *People v. Simpson*, 2015 IL 116512, ¶ 16, the accused told a prosecution witness that he "bashed" the murder victim's head and struck him 30 times with a bat. The prejudicial effect of attributing such statements to criminal defendants is obvious, but the resulting convictions were reversed after the statements were erroneously presented to petit juries. Courts are to "proceed

with restraint and ascertain preindictment denial of due process only with certainty." *Lawson*, 67 Ill. 2d at 457. An indictment, therefore, should be dismissed only upon an "unequivocally clear denial of due process," which did not occur here. See *Lawson*, 67 Ill. 2d at 456.

¶ 67 The dissent also is bothered by our alleged disregard for the technical definition of "accountability" and its relevance in the grand jury setting (*infra* ¶ 128). But again the dissent cites no mandate that "accountability" be explained to the grand jury to make clear which codefendant pulled the trigger. In fact, the pleading requirements for indictments support the opposite conclusion. "A defendant charged as a principal can be convicted on a theory of accountability if supported by the evidence." *People v. Ceja*, 204 Ill. 2d 332, 361 (2003). Thus, the notion that a grand jury must be advised on accountability runs counter to the well-settled idea that "[i]t is proper to charge a defendant as a principal even though the proof is that the defendant was only an accomplice." *Ceja*, 204 Ill. 2d at 361. Because an indictment need not specify whether the accused is charged as a principal or an accomplice, we respectfully disagree with the dissent's view that the State's failure to advise the grand jury of its accountability theory contributed to a due process violation. Indeed, the grand jury heard unequivocal evidence that Garcia, and not defendant, pulled the trigger, which indicates that defendant was indicted under an accountability theory.

¶ 68 The prosecutor is not required to instruct the grand jury on the definition of accountability. A grand jury proceeding is not an adversarial hearing in which the guilt or innocence of the accused is adjudicated; rather, it is an *ex parte* investigation to determine whether a crime has been committed and whether criminal proceedings should be instituted against any person. *People v. Creque*, 72 Ill. 2d 515, 527 (1978). In fact, courts have consistently rejected rules that would effectively turn grand jury proceedings into preliminary

trials. *Creque*, 72 Ill. 2d at 527-28; see also *United States v. Calandra*, 414 U.S. 338, 349-52 (1974) (declining to extend the exclusionary rule to grand jury proceedings); *United States v. Dionisio*, 410 U.S. 1, 17 (1973) ("[a]ny holding that would saddle a grand jury with minitrials and preliminary showings would assuredly impede its investigation and frustrate the public's interest in the fair and expeditious administration of the criminal laws"); *People v. J.H.*, 136 Ill. 2d 1, 10 (1990) ("[i]nasmuch as the grand jury does not finally adjudicate guilt or innocence, it has traditionally been allowed to pursue its investigation unrestrained by the technical evidentiary and procedural restrictions applicable to a criminal trial").

¶ 69    In *Creque*, the defendant claimed that the indictment should be dismissed because the prosecutor did not instruct the grand jury as to the difference between aggravated battery and attempted murder. Our supreme court responded that a criminal defendant "is entitled to a proper instruction at trial, but that requirement is not applicable at the accusatorial stage." *Creque*, 72 Ill. 2d at 527. By finding error in the lack of an accountability instruction, the dissent conflates grand jury proceedings with a trial. "While in cases such as this there is some temptation to transform the grand jury proceedings into a 'kind of preliminary trial' (*Costello v. United States*, [350 U.S. 359, 363 (1956)]), the most important protection for the accused in our system of law is a fair trial itself." *Creque*, 72 Ill. 2d at 527. Here, defendant was convicted after a full and fair trial.

¶ 70    At the hearing on his motion to dismiss the indictment, defendant presented no evidence that he was actually and substantially prejudiced by Officer Maier's affirmations that he "confessed" and flashed gang signs at Gonzalez. First, because, as we determine, there was enough evidence to convict defendant, there was clearly enough evidence to indict defendant even if Officer Maier had more accurately described defendant's interview with the other

officers. See *United States v. Mechanik*, 475 U.S. 66, 67 (1986) ("We believe that the petit jury's verdict of guilty beyond a reasonable doubt demonstrates *a fortiori* that there was probable cause to charge the defendants with the offenses for which they were convicted."). The trial proceeded without any mention of a "confession" by defendant, and his conviction confirms the grand jury's probable-cause finding.

¶ 71    Second, even if the guilty verdict were not itself proof of probable cause worthy of indictment, the remaining evidence presented at the hearing shows that defendant admitted to conduct supporting the inference that he and Garcia shared a common criminal design. Defendant's initiation and escalation of the confrontation was confirmed by the surveillance video that was viewed by the trial court at the hearing. At the request of defense counsel, the trial court also viewed portions of the video-recorded police interview of defendant. While it is true that this evidence was not presented to the grand jury, defense counsel made the strategic decision to introduce it in support of the motion to dismiss the indictment, and defendant does not allege ineffectiveness related to that decision. Counsel made the calculated decision that the surveillance and interview videos undermined Officer Maier's testimony. To disregard that evidence, introduced by counsel and considered credible by the trial court, would amount to advocacy on behalf of defendant. Furthermore, in this appeal we are called upon to determine whether the trial court erred in denying defendant's motion to dismiss the indictment after conducting a hearing that included the presentation of this evidence.

¶ 72    Defendant admitted that he was at least a former member of the Latin Kings. Defendant admitted directing gang-related trash talk at Gonzalez, whom he identified as a rival gang member. Defendant also admitted that he and Garcia followed Gonzalez into the parking lot and that he intended to fight Gonzalez. Under these circumstances, the grand jury would have

indicted defendant even if the challenged testimony by Officer Maier had been excised from the proceedings. See *Legore*, 2013 IL App (2d) 111038, ¶ 23; see also *People v. Hruza*, 312 Ill. App. 3d 319, 323 (2000) (even if the grand jury hears inaccurate testimony, an indictment should not be dismissed where the remaining evidence, the accuracy of which is not disputed, is sufficient to support the indictment). As such, there was no unequivocally clear denial of due process resulting in actual and substantial prejudice. See *Oliver*, 368 Ill. App. 3d at 694-95.

¶ 73 Acknowledging the prosecution's obligation to present accurate and complete testimony before the grand jury, the trial court remarked that "[t]he way some of the questions were asked is not exactly a model of clarity." We agree with the court that the officer's testimony could have been presented more clearly and completely, and we do not condone the ambiguities that the prosecution elicited. However, to obtain a dismissal of the indictment for a due process violation, defendant had the burden of establishing that the error was "unequivocally clear" and resulted in "actual and substantial" prejudice. See *Oliver*, 368 Ill. App. 3d at 694-95. Defendant's challenge to the indictment rises and falls on this extremely limited scope of review, which supports the court's decision not to dismiss the indictment.

¶ 74 Finally, we comment on defendant's accusation that the ASA who questioned Officer Maier "deliberately and intentionally misled the grand jury." Defendant claims that "an intent to mislead the grand jury can easily be inferred from the leading and pointed questions asked by the prosecutor."

¶ 75 To obtain a dismissal of an indictment on the ground of prosecutorial misconduct, the "defendant must *** show that the prosecutors prevented the grand jury from returning a meaningful indictment by misleading *** it." *DiVincenzo*, 183 Ill. 2d at 258. The alleged

misconduct "must rise to the level of a deprivation of due process or a miscarriage of justice." *DiVincenzo*, 183 Ill. 2d at 257.

¶ 76 Defendant has repeatedly accused the prosecution of "deception" and "misleading" the grand jury, but he did not establish at the hearing that a miscarriage of justice occurred. At worst, the colloquy before the grand jury could be interpreted as an imprecise representation of defendant's and Garcia's statements to the police and hand gestures toward Gonzalez. Defendant offers no evidence that either the ASA or Officer Maier deliberately attempted to mislead the grand jury. In fact, defendant cites no specific involvement of the ASA or Officer Maier in the investigation that would suggest that either should have known that the affirmations were incomplete or inaccurate. For instance, defendant does not claim that the ASA or Officer Maier had first-hand knowledge of the interviews of defendant and Garcia.

¶ 77                           B. Admission Against Penal Interest

¶ 78 Garcia stated during his police interview that he alone was responsible for the murder and that neither defendant nor anyone else should be charged with any offense. He denied that the murder was gang-related or that defendant "had anything to do with this." The trial court admitted Garcia's statement that he was the shooter but excluded his statement that defendant should not be charged.

¶ 79 On appeal, defendant argues that the trial court erred because the excluded statement was admissible as an admission against Garcia's penal interest. The admission of evidence falls within the sound discretion of the trial court, and we will not reverse the trial court unless that discretion was plainly abused. *Snelson v. Kamm*, 204 Ill. 2d 1, 33 (2003). "A court abuses its discretion only if it acts arbitrarily, without the employment of conscientious judgment, exceeds

the bounds of reason and ignores recognized principles of law; or if no reasonable person would take the position adopted by the court." *Payne v. Hall*, 2013 IL App (1st) 113519, ¶ 12.

¶ 80 Defendant concedes that Garcia's statement was hearsay, which is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Jan. 1, 2011). Hearsay is not admissible unless it falls within a recognized exception. Ill. R. Evid. 802 (eff. Jan. 1, 2011); *People v. Cloutier*, 178 Ill. 2d 141, 154 (1997).

¶ 81 Defendant argues that Garcia's statement was admissible pursuant to the hearsay exception created by *Chambers v. Mississippi*, 410 U.S. 284 (1973), where the Supreme Court held that due process requires the admission of an out-of-court statement that the declarant, and not the defendant, committed the crime, provided that the trial court finds it to be trustworthy. *Chambers*, 410 U.S. at 302; *People v. Bowel*, 111 Ill. 2d 58, 66 (1986) (recognizing *Chambers*). The Court acknowledged that, although such an out-of-court confession would generally be inadmissible hearsay, "the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Chambers*, 410 U.S. at 302.

¶ 82 The *Chambers* Court set out four factors of trustworthiness: (1) whether the declaration was made spontaneously, to a close acquaintance, shortly after the crime occurred; (2) whether it was corroborated by other evidence; (3) whether it was self-incriminating and against the declarant's penal interest; and (4) whether there was an adequate opportunity for the State to cross-examine the declarant. *Chambers*, 410 U.S. at 300-01. The *Chambers* factors are merely guidelines to admissibility; the presence of all four factors is not required. *People v. Tenney*, 205 Ill. 2d 411, 435 (2002).

¶ 83    Illinois Rule of Evidence 804(b)(3) (eff. Jan. 1, 2011), which codified *Chambers*, provides that a statement of an unavailable declarant is admissible if it is a

"statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.  A statement tending to expose the declarant to criminal liability and offered in a criminal case is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

¶ 84    Defendant argues that Garcia's statement that defendant should not be charged was "the critical portion of Garcia's statement that bore directly on whether [defendant] was accountable for Garcia's actions."  Defendant overstates the relevance and trustworthiness of the statement.  Garcia made the statement on the day after the offense, which weighs in favor of admissibility, but the remaining factors support the trial court's exclusion of the evidence.

¶ 85    Defendant claims that the statement was corroborated by the surveillance video, which showed that Garcia was the shooter, but the video undermined Garcia's other statements.  The video did not establish that Garcia "acted alone," because it showed him and defendant walking side-by-side and trash talking with Gonzalez as they exited the store and followed him across the parking lot.  Garcia also told the police that the crime was not gang-related, but the video shows him flashing gang signs at Gonzalez.  The surrounding circumstances undermine the trustworthiness of the excluded statement.

¶ 86    Garcia's admission that he was the shooter was self-incriminating and against his penal interest, but his claim that defendant should not be charged was not.  Garcia's statement that

- 27 -

defendant should not be charged did not foreclose defendant's criminal liability. Whether defendant was accountable for Garcia's conduct is different from whether Garcia believed that defendant should be charged. The former was a factual issue to be determined by the trier of fact, while the latter was merely Garcia's opinion, which is why the former was presented to the jury and the latter was not. As the trial court astutely observed, Garcia's opinion was not relevant and would not assist the jury in determining whether defendant should be held accountable for Garcia's actions.

¶ 87 Defendant relies on *People v. Gray*, 378 Ill. App. 3d 701 (2008), in which a new trial was granted based on the erroneous exclusion of the codefendant's statement at Gray's trial. The victim bragged to coworkers that he had inherited a large sum of money, so Gray and his codefendant went to the victim's home late at night intending to take it. *Gray*, 378 Ill. App. 3d at 702-03. The victim did not turn over all the money, and, over several hours, the codefendant struck and stabbed the victim until he died. During the incident, Gray restrained the victim's pregnant girlfriend, occasionally struck the victim, and stepped outside the house momentarily but did not leave when he had the opportunity to do so. *Gray*, 378 Ill. App. 3d at 703-04. The next morning, the codefendant told the police that the murder " 'was all me.' " *Gray*, 378 Ill. App. 3d at 706. He claimed that Gray did not know what the codefendant was going to do and that Gray did not touch the victim. *Gray*, 378 Ill. App. 3d at 706. These statements were excluded at Gray's trial.

¶ 88 The Appellate Court, Fourth District, held that the statements were exculpatory as to Gray because they supported his bystander's defense that he was not accountable for the codefendant's actions. The court identified as corroborating evidence the codefendant's conviction of first-degree murder and the State's argument during the codefendant's direct

appeal that he participated in the offense more than Gray did. *Gray*, 378 Ill. App. 3d at 711. The court also emphasized the victim's girlfriend's statements to the police that Gray did not do anything, she could tell that Gray did not want to be there, and Gray "was the reason [she] was still alive." *Gray*, 378 Ill. App. 3d at 712. The court deemed the codefendant's statements sufficiently reliable because the police had the opportunity to thoroughly question him during a video-recorded interview and he did not stand to profit by admitting his dominant role in the crime. The State had clear evidence of the codefendant's guilt, but his confession increased the likelihood of a more severe sentence. *Gray*, 378 Ill. App. 3d at 710.

¶ 89     This case is factually distinguishable in that the State presented evidence that Garcia was motivated to protect defendant in a way that the codefendant in *Gray* was not. At the time of his police interview, Garcia was aware that he would be convicted and would receive a long prison term. He even told the officers, "I just want to get my sentence, man." His statement purporting to exculpate defendant can reasonably be interpreted as an effort to insulate a fellow gang member, which undermines the statement's trustworthiness. Furthermore, Garcia disavowed before his own trial any involvement in the murder, and the trial court here was aware of his recantation when ruling on the admissibility of his opinion that defendant should not be charged. Garcia's inconsistency diminishes the trustworthiness of the excluded statement. We conclude that the trial court did not abuse its discretion in excluding it.

¶ 90                                    C. Closing Argument

¶ 91     Defendant also argues that he is entitled to a new trial because the prosecutor's closing argument contained at least 16 statements that Garcia held the position of "security" in the Latin Kings and there was no evidence to support the assertion. The State responds that defendant's failure to object at trial resulted in forfeiture of the issue. To preserve an issue for appeal, a

defendant must raise an objection at trial and raise the issue in a posttrial motion. *Enoch*, 122 Ill. 2d at 186. Conceding that he forfeited the issue, defendant argues that the plain-error doctrine compels reversal because the error was serious and the evidence was closely balanced.

¶ 92 We may review an unpreserved error under the plain-error doctrine, found in Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967), which provides a limited and narrow exception to the general rule of procedural default. *People v. Lewis*, 234 Ill. 2d 32, 42 (2009). There are two avenues for arguing plain error, and defendant relies on both. The plain-error doctrine allows a reviewing court to consider unpreserved error where either: (1) a clear or obvious error occurs and the evidence is so closely balanced that such error threatens to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurs and is so serious that it affects the fairness of the defendant's trial and challenges the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Walker*, 232 Ill. 2d 113, 124 (2009); *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). In both instances, the burden of persuasion remains on the defendant. *People v. Herron*, 215 Ill. 2d 167, 187 (2005) (citing *People v. Hopp*, 209 Ill. 2d 1, 12 (2004)).

¶ 93 The first step in conducting plain-error review, however, is to determine whether error occurred at all. *Walker*, 232 Ill. 2d at 124. There exists a conflict among Illinois Supreme Court cases regarding the standard of review for remarks made during closing argument. In *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007), and *People v. Sims*, 192 Ill. 2d 592, 615 (2000), our supreme court suggested that we review this issue *de novo*, because the prosecutor's statements are reflected in the transcripts and are therefore undisputed, leaving only a legal question. In contrast, in *People v. Hudson*, 157 Ill. 2d 401, 441 (1993), our supreme court suggested that the trial court is in a better position to rule on objections during closing argument, and review is

therefore for an abuse of discretion. We need not take a position in this case, as defendant's claim fails under either standard. See *People v. Johnson*, 385 Ill. App. 3d 585, 603 (2008) ("we do not need to resolve the issue of the appropriate standard of review at this time, because our holding in this case would be the same under either standard").

¶ 94  It is well established that prosecutors are afforded wide latitude in closing argument, and improper remarks will not merit reversal unless they result in substantial prejudice to the defendant. *People v. Kitchen*, 159 Ill. 2d 1, 38 (1994) (citing *People v. Pittman*, 93 Ill. 2d 169, 176 (1982)). During closing argument, the prosecutor may comment on the evidence presented or reasonable inferences drawn from that evidence, respond to comments made by defense counsel that clearly invite response, and comment on the credibility of witnesses. *People v. Moody*, 2016 IL App (1st) 130071, ¶ 60. However, it is improper for a prosecutor to argue inferences or facts not based upon the evidence. *People v. Johnson*, 208 Ill. 2d 53, 115 (2003). Typically, a timely objection and an instruction to the jury to disregard the improper argument are sufficient to cure the error. *Moody*, 2016 IL App (1st) 130071, ¶ 60. On review, the closing argument must be viewed in its entirety and remarks must be viewed in context. *Kitchen*, 159 Ill. 2d at 38.

¶ 95  Defendant argues that the State's references to Garcia serving as "security" for the Latin Kings were misstatements of the evidence that "were highly prejudicial because they provided the critical piece of evidence that the State's case was missing—proof of accountability." We disagree. First, Garcia's status in the gang was not a necessary element for proving accountability. One is accountable for the conduct of another when, "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of

the offense." 720 ILCS 5/5-2(c) (West 2012). To prove defendant's accountability, the State presented evidence of gang affiliation to support the inference that defendant and Garcia acted with a common criminal design. But other circumstantial evidence, including defendant's admission that he exited the store intending to fight Gonzalez, also supported that theory.

¶ 96 Second, we disagree with defendant that the State misstated the evidence by characterizing Garcia as "security." Tattoos, clothing, hand signs flashed in photographs and on the surveillance video, and the manner of wearing their caps were presented to the jury as evidence that defendant and Garcia were Latin Kings. Also, Officer Anderson opined that, based on his training, experience, street contacts, and discussions with other officers, as well as the surveillance video, the photographs, and Officer Grace's report, defendant and Garcia were affiliated with the Latin Kings at the time of the shooting.

¶ 97 Officer Anderson testified generally to gang hierarchy. He described the role of "security," including the handling, management, and distribution of guns. Although Officer Anderson did not identify Garcia as "security," in closing argument the prosecution was permitted to comment on the evidence and advocate the inference that Garcia's conduct as shown in the surveillance video was consistent with him serving in that role.

¶ 98 The prosecution is afforded wide latitude in closing argument, and the jury was instructed that it should consider "reasonable" inferences based on the evidence. Thus, the State's characterization of Garcia's status need have been only arguably reasonable. The State's characterization did not amount to improper argument simply because the jury might have found it unpersuasive. Defendant has identified nothing in the record to indicate that the jury was misled by the State's closing argument. In the absence of error during closing argument, we reject defendant's claim of plain error.

¶ 99                    D. Sufficiency of the Evidence

¶ 100   Finally, we address defendant's contention that he was not proved guilty beyond a reasonable doubt. Defendant argues that the State failed to prove his accountability through a common criminal design.

¶ 101   On a challenge to the evidence supporting a criminal conviction, a reviewing court does not retry the defendant. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). "When reviewing the sufficiency of the evidence, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' (Emphasis in original.)" *People v. Bishop*, 218 Ill. 2d 232, 249 (2006) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "Testimony may be found insufficient under the *Jackson* standard, but only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). Our duty is to carefully examine the evidence while giving due consideration to the fact that the finder of fact saw and heard the witnesses. The testimony of a single witness, if it is positive and the witness is credible, is sufficient to convict. *Smith*, 185 Ill. 2d at 541. The credibility of a witness is within the province of the trier of fact, whose finding is entitled to great weight but is not conclusive. We will reverse a conviction where the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *Smith*, 185 Ill. 2d at 542. This standard of review applies regardless of whether the evidence is direct or circumstantial and regardless of whether the defendant was tried before the bench or a jury. *People v. Cooper*, 194 Ill. 2d 419, 431 (2000).

¶ 102   Defendant does not dispute that Garcia committed first-degree murder, but he denies

accountability for Garcia's conduct. He insists that he had no idea that Garcia would shoot Gonzalez and therefore he did not share a common criminal design with Garcia. A verbal agreement between offenders is "not necessary to establish a common purpose to commit a crime." *People v. Perez*, 189 Ill. 2d 254, 267 (2000). Rather, the trier of fact may infer accountability from "the circumstances surrounding the perpetration of the unlawful conduct," including "the defendant's presence during the commission of the offense, the defendant's continued close affiliation with other offenders after the commission of the crime, the defendant's failure to report the incident, and the defendant's flight from the scene." *People v. Batchelor*, 171 Ill. 2d 367, 376 (1996). These factors "are not required for a finding of accountability and are instead used as considerations." *People v. Johnson*, 2014 IL App (1st) 122459-B, ¶ 152. Evidence that the defendant voluntarily attached himself to a group bent on illegal acts, with knowledge of its design, also supports an inference that he shared the common purpose and will sustain his conviction of an offense committed by another. *Fernandez*, 2014 IL 115527, ¶ 13.

¶ 103 However, mere presence at the scene of a crime, or even presence coupled with flight from the scene or knowledge of the commission, is not sufficient to establish accountability. *Perez*, 189 Ill. 2d at 268. "Accountability focuses on the degree of culpability of the offender and seeks to deter persons from *intentionally* aiding or encouraging the commission of offenses." (Emphasis omitted.) *Perez*, 189 Ill. 2d at 268. Unless an alleged accomplice intends to aid the commission of a crime, no guilt attaches. *Perez*, 189 Ill. 2d at 268. Guilt by association, even association with known gang members, is a discredited doctrine. *Perez*, 189 Ill. 2d at 266.

¶ 104 Even if the evidence did not prove beyond a reasonable doubt that defendant shared Garcia's intent to murder Gonzalez, the evidence supports the reasonable inference that

defendant and Garcia were acting with a common criminal design. Defendant and Garcia, in the opinion of an expert, were members of the Latin Kings, and defendant thought Gonzalez was a member of a rival gang. Defendant was heard to make, and admitted making, gang references to Gonzalez while arguing and talking trash with him. Defendant also admitted previously having a fistfight with Gonzalez. Defendant admitted that he knew Garcia but was evasive about their relationship and Garcia's role as the shooter. Finally, defendant admitted that he exited the store intending to fight Gonzalez. The State presented ample evidence from which the jury could infer that defendant's trash talking and pursuing Gonzalez from the store was a cue to Garcia to escalate the confrontation. Officer Anderson testified that a senior gang member might direct a subordinate to seek out rivals and fight, shoot, or stab them to gain respect within the gang.

¶ 105  Garcia's act of shooting Gonzalez was in furtherance of the common design to harm Gonzalez. Thus, defendant, as a party to the design, is equally responsible for Garcia's act. See *Perez*, 189 Ill. 2d at 267. Evidence of an express agreement between defendant and Garcia was not necessary to establish a common purpose to commit a crime, as defendant's cues to Garcia established his participation in the criminal scheme, even though there was no evidence that defendant directly participated in the actual crime of shooting Gonzalez. See *Perez*, 189 Ill. 2d at 267. Each factor of accountability supports the jury's verdict: defendant was present at the shooting, he fled with the shooter to the same location, and he talked about the shooting only after being approached by the police, who had identified defendant on the surveillance video. See *Perez*, 189 Ill. 2d at 267.

¶ 106  Viewing the totality of the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found beyond a reasonable doubt that defendant

was accountable for the first-degree murder committed by Garcia. See *Cunningham*, 212 Ill. 2d at 278.

¶ 107                                    III. CONCLUSION

¶ 108   First, we hold that the trial court did not err in denying defendant's motions to dismiss the indictment. We conclude that there was sufficient evidence to support the indictment, even without the challenged testimony that defendant confessed to the police and flashed gang signs at Gonzalez. Second, we hold that the trial court did not abuse its discretion in excluding Garcia's statement that defendant should not be charged. Third, we hold that the State's closing argument did not amount to reversible prosecutorial misconduct. Finally, the evidence presented at trial supported the murder conviction beyond a reasonable doubt. For these reasons, the judgment of the circuit court of Lake County is affirmed. As part of our judgment, we grant the State's request that defendant be assessed the state's attorney fee of $50 under section 4-2002(a) of the Counties Code (55 ILCS 5/4-2002(a) (West 2014)) for the cost of this appeal. See *People v. Nicholls*, 71 Ill. 2d 166, 178 (1978).

¶ 109   Affirmed.

¶ 110   JUSTICE JORGENSEN, specially concurring:

¶ 111   I concur with the court's judgment. Defendant faced a high burden to establish reversible error in the context here. However, I write separately to emphasize what was, in my view, the State's poor presentation of evidence to the grand jury.

¶ 112   Defendant did not present any evidence suggesting that either the assistant state's attorney or Officer Maier knew that the statement regarding his alleged confession was inaccurate. During his testimony, the State simply presented Officer Maier with a leading question, and he then took that lead, responding "yes" to the offending question. Nevertheless,

this does not excuse the State's actions. Instead, it reflects that the State appeared before the grand jury either (1) misinformed about critical facts of the case or (2) unprepared and operating under an assumption.

¶ 113   The use of a grand jury is a very powerful tool—one solely in the prosecution's hands. The vesting of such authority mandates at the very least that an assistant state's attorney appearing before the grand jury be prepared, with full and accurate knowledge of the facts. We expect that he or she has reviewed anticipated testimony with each witness and has verified the critical facts contained therein. We further expect such preparation so that clear and unambiguous questions can be posed before the grand jury. Here, the State failed to satisfy these basic standards for preparation and, further, the high standards of professional ethics that we hold for the prosecution. Indeed, as the court's judgment pointed out, "under different facts, testimony about a confession that did not occur certainly can be misleading and reversible." *Supra* ¶ 64.

¶ 114   JUSTICE McLAREN, dissenting:

¶ 115   "[T]he grand jury is an integral part of the court and not the tool of the prosecutor and neither the prosecutor nor the grand jury is vested with power to proceed without regard to due process." *People v. Sears*, 49 Ill. 2d 14, 36 (1971). The grand jury is "to act as a 'shield' against arbitrary prosecutions" and to be "a primary security to the innocent against hasty, malicious and oppressive persecution." *People v. Rodgers*, 92 Ill. 2d 283, 289 (1982). However, no one is protected when the State is allowed to present inaccurate, false, or misleading statements to the grand jury with impunity. I find that defendant's due process rights were clearly violated when the State told the grand jury that defendant confessed. I submit that the majority distorts and minimizes the distinction between a confession and an admission and displays an indifference to

the substantial presumption of guilt associated with a "confession." Both the majority and the special concurrence improperly rely on a supposed lack of prosecutorial intent to present false or misleading evidence to the grand jury, contrary to our supreme court's holding in *DiVincenzo* and this court's holding in *Oliver*. Further, the majority invades the province of the grand jury by imposing its own counterfactual "reality" on the grand jury's deliberations. Therefore, I must dissent.

¶ 116 Despite the fact that defendant consistently denied even knowing that Garcia had a gun, let alone that he was going to shoot Gonzalez, the State told the grand jury that both defendant and Garcia " 'did make confessions.' " *Supra* ¶ 58. The majority finds that this testimony before the grand jury "was ambiguous and not necessarily false." *Supra* ¶ 59. Perhaps, instead of relying only on partial dictionary definitions of "confess" (see *supra* ¶ 59), we should see how the courts of this state have defined what a confession is. A confession is "a direct acknowledgment of guilt on the part of the accused, either by a statement of the details of the crime or an admission *of the ultimate fact*." (Emphasis added.) *Nitti*, 312 Ill. at 92. "A confession is an acknowledgement of guilt, and not of any particular fact connected with the case ***." *People v. Manske*, 399 Ill. 176, 184-85 (1948). It is "a voluntary declaration by a person charged with crime of his agency or participation in the crime, and not merely a declaration or admission of facts criminating in their nature or tending to show guilt." *People v. Stapleton*, 300 Ill. 471, 476 (1921). "It is limited in its meaning to the commission of a criminal act and is an acknowledgment or admission of participation in it." *Id*. It is "a comprehensive admission of guilt or of facts which necessarily and directly imply guilt." *People v. Rollins*, 119 Ill. App. 2d 116, 131 (1970). A confession is "limited to the criminal act, and does not include statements, declarations or admissions of fact incriminating in their nature of tending to prove guilt." *People*

*v. Rupert*, 316 Ill. 38, 44 (1925). A confession must acknowledge all the elements of a crime and is a confession of guilt. *People v. Georgev*, 38 Ill. 2d 165, 175 (1967).

¶ 117 Given how our case law has defined what a confession is, it is incomprehensible how the majority can find that "Officer Maier's statement that defendant 'confessed' was ambiguous and not necessarily false." *Supra* ¶ 59. A confession is "an acknowledgement of *guilt*, and not of any particular fact connected with the case." (Emphasis added.) *Manske*, 399 Ill. at 184-85. Defendant did not acknowledge guilt of anything, least of all first-degree murder. He always maintained that he did not know that Garcia was armed, let alone that he was going to shoot Gonzalez. The majority cannot in good faith point to a confession to this murder, no matter how "ambiguous," without a legal redefinition of both "confession" and "ambiguous."

¶ 118 Instead, the majority asserts that defendant's claim that he did not confess to any involvement in the murder "is refuted by defendant's acknowledgements during the police interview." *Supra* ¶ 60. The majority further attempts to rationalize this lack of a confession by listing a series of facts to which defendant "admitted." Our supreme court has defined an admission as

> "a statement by the accused of a fact or facts pertinent to the issue, and tending, in connection with proof of other facts, to prove his guilt. Of itself an admission is never sufficient to authorize a conviction. *The principle of confessions has no application to admissions*." (Emphasis added.) *Nitti*, 312 Ill. at 92.

An acknowledgment of facts that *tend* to establish guilt *is not a confession*. *Manske*, 399 Ill. at 185. The majority not only fails to distinguish between a confession and an admission, it attempts to equate the two terms.

¶ 119   The majority also fails to appreciate the staggering effect that tales of a "confession" can have on jurors, whether grand or petit.  "A confession is like no other evidence." *Fulminante*, 499 U.S. at 296.  It is " 'probably the most probative and damaging evidence that can be admitted against' " a defendant.  *Id.* (quoting *Bruton v. United States*, 391 U.S. 123, 139-140 (White, J., dissenting, joined by Harlan, J.).  It is so damaging that "a jury should not be expected to ignore it even if told to do so.  *Id.* at 292 (White, J., dissenting, joined by Marshall, Blackmun, and Stevens, JJ.).  The Illinois Supreme Court has stated that " 'a confession is the most powerful piece of evidence the State can offer, and its effect on a jury is incalculable.' " *Simpson*, 2015 IL 116512, ¶ 36 (quoting *People v. R.C.*, 108 Ill. 2d 349, 356 (1985)).  There is nothing more damning than a defendant's own words admitting his guilt.  Here, the State falsely told the grand jury that defendant had made such a damning statement, and defendant did not have the opportunity to remediate this false, damning statement.  By attempting to claim ambiguity as an excuse, the majority begs the definition of the word while disregarding its effect.

¶ 120   Here, the State's preprinted indictment alleged that defendant and Garcia committed first-degree murder "in that the said defendants *** shot Gabriel Gonzalez about the body."  The grand jury was told that both defendant and Garcia "did make confessions."  The majority raises and then attacks a straw man, attempting to distract from the false testimony by asserting that there is "no authority for the proposition that a grand jury must be advised on the distinction between a confession and an admission when those terms arise in testimony." *Supra* ¶ 64.  I do not assert that the grand jury should have been instructed on the difference.  What I assert is that the grand jury should not be presented with false and prejudicial evidence.  In this case, it is the State and its witness who should have been instructed on the distinction between a confession and an admission.  The majority first attempts to deflect the error here with a *non sequitur* and

then attempts to dismiss the issue as one of ambiguity or lack of clarity. *Supra* ¶ 73. The special concurrence does no better, treating this as nothing more than a teaching moment for a prosecutor who was "misinformed" or "unprepared" to the point that the prosecutor "failed to satisfy *** basic standards for preparation and *** the high standards of professional ethics that we hold for the prosecution." *Supra* ¶¶ 112-13. Both the majority and the special concurrence seem content to lecture the ASA to do better next time rather than confront the real issue: that *this* defendant was indicted after the State presented false and misleading testimony to the grand jury, telling it that defendant had confessed when he had, in fact, not confessed.

¶ 121   Further, the majority claims to need an explanation as to why it should presume that the grand jury thought that the State meant that defendant actually confessed, rather than admitted to some facts, when the State told the grand jury that defendant confessed. See *supra* ¶ 64. Perhaps a simple reading of Merriam Webster's definition of "confession," coupled with the belief that the State means what it says, will suffice. Commonly, "confession" is defined as "a statement of guilt or obligation in a matter pertaining to oneself." Webster's Third New International Dictionary 475 (1993). Even colloquially, television culprits do not "confess" to individual facts that add up to a finding of guilt; they confess to the crime. A common, lay understanding of the term "confession" will not lead a grand jury to conclude that a defendant "admitted" to individual bits and pieces of a story that, in connection with proof of some other facts and law about which it has not been instructed, prove his guilt. The majority is attempting to rationalize the State's emulation of Humpty Dumpty: "When I use a word, *** it means just what I choose it to mean—neither more nor less."[4]

---

[4] " 'The question is,' said Alice, 'whether you *can* make words mean so many different things.' 'The question is,' said Humpty Dumpty, 'which is to be master—that's

¶ 122   The legal and the common definitions of confession mesh elegantly; indeed, they are the same.  The majority takes the singular meaning and turns it into an oxymoron.  The majority's definition denies the grand jury's use of common sense, imposes a hypertechnical meaning on the term, and ascribes to the grand jury legal and factual knowledge that is shown not to exist.  It is the creation of a majority scrambling to find any support, no matter how tenuous, for its theory that the State did not present false evidence to the grand jury.

¶ 123   In order to invalidate an indictment, a defendant must establish that testimony before the grand jury was "so deceptive or inaccurate that it affected the grand jury's deliberations." *People v. Holmes*, 397 Ill. App. 3d 737, 742 (2010).  Can the majority really be saying that the grand jury's deliberations were not affected by telling it that defendant confessed?  The Salem witch trials were not based on admissions.  Jon Burge coerced false confessions, not admissions.  The majority's attempt to disregard the differences between a confession and an admission and meld the distinct entities into one is both counterfactual and disingenuous.  Further, according to the majority's analysis, the State could tell every grand jury that every defendant confessed, and no consequences would obtain so long as there was "sufficient remaining evidence" supporting the charge.  Could the State have told the grand jury without consequence that defendant pulled the trigger in this case?  According to the majority, there was still sufficient remaining evidence that defendant could be accountable for the murder even if the "fact" of the confession is disregarded.  Such a standard "would pervert all notions of justice, because an indictment would stand as long as there is some supporting evidence, no matter how egregious the prosecutorial

---

all.' " (Emphasis in original.)   Lewis Carroll, Through the Looking-Glass, and What Alice Found There 124 (MacMillan Co. 1899).

misconduct may be." (Emphasis omitted.) *People v. J.H.*, 136 Ill. 2d 1, 24 (1990) (Moran, C.J., dissenting, joined by Clark, J.).

¶ 124 Here, no specifics of these "confessions" were given to the grand jury, other than the statement "To include Jose Garcia, in fact he did pull out a gun and shoot at the victim." This in itself is of little value, as it shows only that Garcia shot "*at*" the victim, not that Garcia shot and killed him. The majority characterizes this lack of detail regarding defendant's "confession" as "ephemeral" and apparently finds this to be a benefit. See *supra* ¶ 65. However, telling the grand jury merely that a defendant confessed is perhaps even more damning than telling a defendant's actual words. Being told only that a defendant has "confessed" allows a juror to put aside any inquiry as to what role the defendant might actually have played in the commission of the crime to which he has "confessed" and of which he is "guilty." Specific evidence, such as the statement that Garcia shot at Gonzalez, can be overshadowed or rendered immaterial by the mere statement that the defendant has confessed to the crime. The majority's assertions that defendant's argument "exaggerates the probative value" of the statement that defendant confessed (*supra* ¶ 58) and that "there was no actual and substantial prejudice resulting in an unequivocally clear denial of due process" (*supra* ¶ 72) reflect a disregard or ignorance of the presumptive weight of a confession's effect due to human nature.

¶ 125 The majority pulls a sleight of hand, dismissing the importance of whether "defendant explicitly 'confessed' to being accountable for Garcia's conduct." *Supra* ¶ 63. How does a person "confess" to being accountable for another's act? "[A]ccountability is not a separate offense but merely an alternative manner of proving a defendant guilty of the substantive offense." *Ceja*, 204 Ill. 2d at 361. How does one "confess" to an alternative manner of proof? At best, defendant admitted to certain facts that could, *in connection with proof of other facts*,

prove his guilt. However, this is not a confession; this is known as an admission, which is specifically *not* the same as a confession. See *Nitti*, 312 Ill. at 93. The validity of the indictment could not turn on whether defendant explicitly confessed to being accountable for Garcia's conduct, as he did not, *and could not*, make such a confession. The majority is referencing some brooding omnipresence in the sky to rationalize how a grand jury *might* indict a defendant based upon evidence falsely and incoherently presented to it.

¶ 126  I am also perplexed by the majority's discussion of prosecutorial misconduct. See *supra* ¶¶ 74-76. More specifically, I am perplexed as to why the majority responds to the single five-sentence paragraph (devoid of citation to case law) in defendant's brief arguing an intent to mislead the grand jury while ignoring the brief's previous paragraph in which defendant argues that "presentation of incorrect and misleading information to the grand jury cannot be excused as unintentional" and includes citation to and analysis of relevant case law. The majority asserts that "[d]efendant offers no evidence that either the ASA or Officer Maier deliberately attempted to mislead the grand jury." *Supra* ¶ 76. The majority does not explain why intentional deception by the State should be treated any differently from unintentional inaccuracy or deception. The special concurrence implies that there is a difference between intentional and unintentional deception but does not explain it, cites no authority for support, and places the onus for proving intentional deception on the defendant. *Supra* ¶ 113.

¶ 127  "The due process rights of a defendant may be violated if the prosecutor deliberately or intentionally misleads the grand jury, uses known perjured or false testimony, *or presents other deceptive or inaccurate evidence*." (Emphasis added.) *DiVincenzo*, 183 Ill. 2d at 257. "Thus, in light of *DiVincenzo*, we hold that the State's presentation of deceptive evidence denied defendant due process, *regardless whether the deception was intentional*." (Emphasis added.) *Oliver*, 368

Ill. App. 3d at 696. Clearly, defendant here argued in the alternative, stating, "Whether or not a showing of intent to mislead the grand jury is required, [defendant] was denied his right to due process." The majority has responded to the argument regarding intent to mislead, defending the honor of the ASA and Officer Maier. Both the majority and the special concurrence fail or refuse to address whether there was deception, regardless of intent to deliberately mislead the grand jury. If claiming a confession where none exists is not deception, then nothing is, other than possibly forging a written confession. If the grand jury's deliberations were affected by the false or misleading information, whether presented intentionally or unintentionally, the indictment should be invalidated. The intent, or lack thereof, behind the deception is not the deciding factor; it is the *effect*.

¶ 128 The majority then shifts focus away from the false testimony to argue that, even if the references to a confession had not been made to the grand jury, the remaining evidence supported the indictment under the theory of accountability. See *supra* ¶¶ 63, 71. "One may be accountable for the conduct of another person when 'either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense.' 720 ILCS 5/5-2(c) (West 2012)." *Supra* ¶ 95. The majority tosses around references to defendant "being accountable for Garcia's conduct" (*supra* ¶ 63) and "the inference that he and Garcia shared a common criminal design" (*supra* ¶ 71), concluding that "the grand jury would have indicted defendant even if the challenged statements by Officer Maier were excised from the proceedings" (*supra* ¶ 72). I am bothered by the majority's failure to define these terms and concepts related to the theory of accountability, analyze what is required for findings regarding these concepts, or tell us their relevance, in a grand jury setting.

¶ 129   However, I am then bewildered at the majority's insistence that these references to accountability and its requirements would have meant *anything* to the grand jury in this case, as *accountability was not raised in the indictment* and there is *no evidence that the grand jury was ever instructed on the issue of accountability*.  The indictment alleged that "defendants *** shot Gabriel Gonzalez."  The majority claims that defendant and Garcia "shared a common criminal design" (*supra* ¶ 71) and states that the grand jury heard "unequivocal evidence that Garcia, and not defendant, pulled the trigger, which supports the indictment against defendant under an accountability theory."  *Supra* ¶ 67.  How was the grand jury to make findings related to accountability and a common criminal design when it was never told that such concepts even existed?  The grand jury was no more likely to base an indictment on "the inference that [defendant] and Garcia shared a common criminal design" than it was to return an indictment based on the fact that defendant was wearing a cocked hat.  The majority not only has made up this rationale out of whole cloth, it has presented a paradigmatic example of a counterfactual conditional: if these things would have happened, then the grand jury would have indicted defendant.  The problem is that things never happened the way that the majority is rationalizing its affirmance.

¶ 130   The majority cites *Ceja* for the proposition that a defendant may be charged as a principal even though the proof shows that he was only an accomplice.  See *supra* ¶ 67.  This type of pleading practice is permitted because, as I stated above, accountability "is merely an alternative manner of proving a defendant guilty of the substantive offense."  *Ceja*, 204 Ill. 2d at 361.  Thus, an indictment need not specify *to a trial jury* whether the accused is charged as a principal or an accomplice.  However, *Ceja* cannot be responsibly read to hold that a grand jury can be

presumed to have *indicted* on a theory of accountability when the grand jury was never told that such a theory existed or was legally proper.

¶ 131 Further, nowhere do I claim that the grand jury should have received formal jury instructions on accountability and that the proceeding should have been turned into an adversarial hearing. See *supra* ¶¶ 68-69. I use the word "instruct" as in to "apprise" or "inform." Certainly the majority is aware that the state's attorney's office plays a substantial role in grand jury proceedings, serving as advisor to the grand jury and informing it of the proposed charges *and the pertinent law*. See *supra* ¶ 55; *DiVincenzo*, 183 Ill. 2d at 254. It is only common sense that a grand jury must be apprised of any crime that it is asked to charge and any concept that it can consider in handing down a charge. The majority's "analysis" of this nonissue is nothing more than a straw man that is raised and then knocked down in an attempt to lend credence to its own counterfactual notion that a collective body can contemplate and opine on a theory on which it was not apprised.

¶ 132 The majority glosses over this by stating that, because the grand jury "heard detailed evidence that defendant and Garcia were fellow gang members who jointly confronted and aggressively pursued the victim, who they thought was a rival gang member," "the validity of the indictment did not turn on whether defendant explicitly 'confessed' to being accountable for Garcia's conduct." S*upra* ¶ 63. I first take issue with the phrase "detailed evidence." The State's entire presentation to the grand jury consisted of 28 questions that Officer Maier answered, including 5 related to his name, his employment, the date of the incident, and the fact that the incident occurred in Lake County. Twenty three questions regarding the incident itself is hardly "detailed." I also take issue with the majority's claim that defendant and Garcia "aggressively pursued Gonzalez." The grand jury heard that Gonzalez "began to walk out of the

store" and then defendant and Garcia "followed him outside, flashing gang signs and arguing with him." *Supra* ¶ 13. The majority makes this read like a pulp novel, with defendant and Garcia chasing after Gonzalez, who is in full flight. The actual evidence is interesting enough; exaggeration and enhancement are unnecessary.

¶ 133 The majority concludes that this "remaining evidence supported the grand jury's determination of probable cause based on defendant's actions." *Supra* ¶ 63. I do not know how to define this artifice; it is hard to imagine an emptier phrase. *What* evidence of *what* actions supported a determination of probable cause to believe that defendant did *what*?

¶ 134 The majority compounds its counterfactual mischief by claiming that, in one of these so-called admissions, defendant "admitted that he and Garcia followed the victim into the parking lot, and intended to fight the victim." *Supra* ¶ 72. However, as the majority states earlier in its opinion, "Defendant told the officers that he expected to fight the victim 'one-on-one,' because someone else joining in would have made it a 'dirty fight.' " *Supra* ¶ 21. The majority also states that defendant admitted "that he followed Gonzalez into the parking lot with Garcia, and intended a fistfight with Gonzalez while Garcia looked on." *Supra* ¶ 60. How could the intent to fight "one on one," while someone "looked on," be evidence of a common criminal design? Again, the majority has doubled-down on the counterfactual conditional: *if* these were the facts, and *if* these facts had been presented to the grand jury, and *if* the grand jury had been informed of the concept of accountability, *then* the grand jury could have determined that defendant was accountable for the shooting. However, these facts were not presented to the grand jury, and the grand jury was not informed about accountability. The State provided *no* theory of accountability to the grand jury, even one as obviously legally and factually incoherent as that

put forth by the majority here, yet the majority concludes that accountability provided the basis for the indictment.

¶ 135  Even if the grand jury had any idea that defendant could be indicted for murder through a theory of accountability, there simply was no evidence presented to the grand jury that would have supported any finding of probable cause.  (See *supra* ¶ 63).  The grand jury was not shown the surveillance video of the events.  The entire examination of Officer Maier before the grand jury consisted of 28 questions, including his name and two questions about his occupation. Officer Maier's testimony showed only that defendant, Garcia, and Gonzalez were at the One Stop Food & Liquor store at the same time; there was no evidence that defendant and Garcia arrived together or knew that the other would be at the store.  Defendant and Garcia were reputed gang members, while Gonzalez had no gang affiliation.  After either defendant or Garcia made a gang reference to Gonzalez, an argument ensued.  Gang signs were flashed,[5] and defendant and Garcia followed Gonzalez out of the store before Garcia pulled out a gun and shot Gonzalez. Both defendants were arrested.  This is the nature and extent of the "detailed evidence" that the majority concludes so overshadowed the false evidence of a confession.  See *supra* ¶ 63.

¶ 136  The trial court viewed the surveillance video as well as the video of the statements given by both defendant and Garcia, neither of which was presented to the grand jury.  The trial court's viewing was necessary, as the court had to determine if defendant did, indeed, confess, and if he did flash gang signs.  However, the trial court then considered this evidence in making "the

---

[5] Officer Maier's testimony that "the defendants are following the victim out of the store flashing gang signs and arguing with him" is equivocal; it could be interpreted as that both defendants were flashing signs and arguing or that one was flashing signs while the other was arguing.  In any event, the video did not show defendant flashing gang signs before the shooting.

following findings as to what happened in the grand jury," "much" of which was "based largely upon the recordings that the Court reviewed." The court made the following findings of "facts" that were *never* presented to the grand jury: (1) defendant "went to the store with his co-defendant. They went together."; (2) defendant "thought that the victim gave him a dirty look"; (3) "defendant then said that the victim was calling him a King killer"; (4) defendant "wanted to and was perfectly willing to have a fight with the victim"; (5) while defendant said that "it didn't involve weapons," defendant "was personally interested in engaging in a physical altercation with the victim"; (6) "To some extent in that way [defendant] started the fight even if [Garcia] finished it by shooting the victim"; and (7) "[defendant] and *** Garcia together pursue[d] the victim." Thus, the court found, even excising the objected-to exchanges, "there is sufficient probable cause before the grand jury to return an indictment for murder against [defendant] if not as a principal, certainly as an accomplice, and I am making no finding that it was not as a principal." The court then declined to "reach the question as to the propriety of" those exchanges.

¶ 137 While the trial court was required to review evidence that was not presented to the grand jury,[6] it erred in the same way the majority does here (see *supra* ¶ 71)—it ascribed to the grand jury knowledge that the court had and stated what it thought the grand jury would have done had it known what the court knew. By doing this, both the trial court *and* the majority have invaded the province of the grand jury. The grand jury did not have all the "facts" that the trial court and the majority had, and thus it could not weigh those facts to determine that probable cause existed. Nor was it presented with the law that both the trial court and the majority have presupposed it

_____

[6] Indeed, both the State and defense counsel presented portions of the video recordings for the trial court's consideration.

knew. Yet both the trial court and the majority have acted as if this information, not possessed by the grand jury, actually informed its decision and supported its indictment.

¶ 138 While finally conceding that the surveillance video and the recorded interview of defendant were shown to the trial court but not to the grand jury (see *supra* ¶ 71), the majority again makes the counterfactual argument that such evidence must be considered as support for a finding that the grand jury did not, and could not, make. The majority further argues that defendant's admission to conduct that supported the indictment (without relating what was actually admitted) was presented *only* to the trial court. However, the majority claims that disregarding evidence that was not presented to the grand jury "would amount to advocacy on behalf of defendant." *Supra* ¶ 71. I submit that considering evidence that was not presented to the grand jury amounts to advocacy on behalf of the State. The majority has exhausted itself trying to find a way to justify—or, at the very least, excuse—the State's false claim of defendant's confession; it has misstated law, conjured evidence, and created a false construct wherein the trial court, rather than the grand jury, determines probable cause based on evidence not presented to the grand jury. Contrary to the majority's claim, we are not called upon to determine if the trial court "erred in denying defendant's motion to dismiss the indictment" (*supra* ¶ 71); rather "we review *de novo* whether defendant was denied due process and, if so, whether that denial was prejudicial. *People v. Oliver*, 368 Ill. App. 3d 690, 695 (2006)" (*supra* ¶ 54).

¶ 139 There was no evidence of a common criminal design or that defendant aided, abetted, agreed or attempted to aid, or planned any offense. Gonzalez was shot and killed by Garcia, and there was no evidence presented to the grand jury that defendant had anything to do with Garcia, other than reputed membership in the same gang, let alone anything to do with Garcia's decision

to shoot Gonzalez. The grand jury never saw the surveillance video; it was not told that defendant wanted to fight Gonzalez. Only the most tenuous link between defendant and Garcia was presented in Officer Maier's grand jury testimony—reputed membership in the same gang. However, there is an implication in both the trial court's decision and the majority's analysis that it is axiomatic that gang membership requires the members to support one another in every criminal endeavor. The majority might have concluded this based on its extensive experience as trial judges. However, this conclusion is not supported by any evidence presented to the grand jury. There was no evidence of any oral agreement or encouragement, no evidence of any physical signal (such as a throat-slitting motion or pantomimed gun), and no expert testimony regarding any special relationship requiring either defendant or Garcia to act. There was not even the fistfight that defendant purportedly wished to engage in. Yet both the trial court and the majority have concluded that they shared a common criminal design. See *supra* ¶ 69. Such a conclusion could be based only on speculation or the majority's experience, not the evidence presented to the grand jury.

¶ 140 It is no defense to say that defendant was found guilty after a trial, so no harm, no foul. See *supra* ¶ 70. This is a fallacy and a *non sequitur*. Such a rule is "especially pernicious" and imposes "unacceptable costs." *Mechanik*, 475 U.S. at 83 (Marshall, J., dissenting). The issue is not whether there was sufficient evidence for proof beyond a reasonable doubt at trial; it is whether there was sufficient proper evidence presented to the grand jury for probable cause to even charge the crime in the first place. It does not matter that the State convicted defendant without mentioning his "confession" to the petit jury. See *supra* ¶ 70. What happens before the petit jury does not solve defects in evidence before the grand jury; if it did, it would make the grand jury meaningless unless the trial resulted in a finding of not guilty. The majority acts as if

the State presented all of its evidence to both the grand jury and the petit jury, asserting that "as we determine that there was enough evidence to convict, there was clearly enough evidence to indict." *Supra* ¶ 70. What has one to do with the other? The evidence presented to the grand jury was 25 answers of "Yes" to leading questions; certainly, the State had something more to say at trial. Further, the majority's reliance on *Mechanik* (*supra* ¶ 70) is less than compelling. In *Mechanik*, the government's improper activity before the grand jury involved the simultaneous presence and testimony of two witnesses, in violation of the federal rules of criminal procedure. *Mechanik*, 475 U.S. at 68 (majority opinion). Can the majority really not see the difference in magnitude between a procedural error as in *Mechanik* and the presentation of false or misleading testimony regarding a nonexistent confession?

¶ 141 If the majority's rationale is acceptable, then what is the point of having grand juries indict people anymore? Taken to its logical conclusion, the majority's position supports the theory that no evidence need be presented to the grand jury so long as the defendant is convicted; the lack of evidence before the grand jury is harmless error if the petit jury is presented with proof beyond a reasonable doubt. If this satisfies due process, then I submit that the grand jury is a subverted vestigial organ that needs to be abandoned and replaced. The grand jury can be traced back in England to 1166 and was recognized in Magna Carta in 1215; however, even England moved on, abolishing grand juries in 1948. See *Grand Jury*, Wikipedia, https://en.wikipedia.org/wiki/Grand_jury (last viewed Jan. 3, 2019) [https://perma.cc/Y6CN-VPY9]. Perhaps it is time for this nation to rely instead on preliminary hearings or some other type of proceeding that gives a potential defendant the opportunity to cross-examine witnesses and respond to egregiously false evidence.

¶ 142 This opinion will apply to saints and sinners, the guilty and the innocent alike. Nonetheless, the majority adopts and adapts a military aphorism[7] for use in the criminal justice system: "Indict them all, let the trial jury sort 'em out." Even the subsequent acquittal of a defendant is not sufficient to right the damage of an improper indictment. "For a wrongful indictment is no laughing matter; often it works a grievous irreparable injury to the person indicted." (Internal quotation marks omitted.) *Rodgers*, 92 Ill. 2d at 289. "[A] wrongful indictment inflicts substantial harm on a defendant not entirely remedied by an acquittal." *Sears*, 49 Ill. 2d at 36.

¶ 143 The majority attempts to ram a square peg into a round hole, and it reeks of desperation to affirm the State's presentation of false evidence to the grand jury. Other than issuing mild admonitions to the State, the majority seems to see no problem in imputing any illegal act by a gang member to any other gang member, based primarily upon presence. The majority essentially gives the State *carte blanche* to present whatever it wants to the grand jury, no matter how false and deceptive, so long as there is any evidence, no matter how equivocal, to support the resulting indictment. That is not the law, never was the law, and should never be the law if the grand jury is to serve its traditional purpose. The majority also gives courts the ability to superimpose a counterfactual prism over grand jury proceedings in order to "find" the necessary law and evidence to support an indictment. No longer "a 'shield' against arbitrary prosecutions"

---

[7] "Kill 'em all, let God sort 'em out." Originally, " '*Caedite eos. Novit enim Dominus qui sunt eius.*' " Literally, " 'Kill them. For the Lord knows those that are His own.' " Attributed to Arnaud Amaury, Abbott of Citeaux and papal legate, at the massacre of Beziers (1209) during the Albigensian Crusade. *Caedite eos. Novit enim Dominus qui sunt eius,* Wikipedia, https://en.wikipedia.org/wiki/Caedite_eos._Novit_enim.Dominus_qui_sunt_eius (last visited Jan. 3, 2019 [https://perma.cc/F7SD-FAB3].

(*Rodgers*, 92 Ill. 2d at 289), the grand jury becomes the proverbial mushroom that is kept in the dark and fed false confessions.